JOHN C. DOLAN, Appellant, v. TRUCK EQUIPMENT COMPANY, a Corporation, and BEULAH M. SLEEPER.—No. 40364.—212 S. W. (2d) 438.

Division One, April 12, 1948.

Rehearing Denied, June 14, 1948.

*James T. Blair, Jr., Geo. O. Durham* and *T. D. Drury* for appellant.

*Moser, Marsalek, Carpenter, Cleary & Carter, G. W. Marsalek* and *Max C. Sigoloff* for respondents.

[439] BRADLEY, C.—By this action plaintiff (appellant) seeks to establish that he is the owner of 75 percent of the capital stock of the Truck Equipment Company, the corporate defendant. The trial court found that plaintiff sold his stock to defendant Sleeper. Plaintiff appealed. The amount in dispute is in excess of $7500, hence the appeal is properly to the supreme court. Sec 3, Art. V, Constitution.

Hereinafter the term defendant has reference to defendant Sleeper unless otherwise indicated. Plaintiff and defendant had been acquainted many years. At the time they became acquainted defendant was working for the Gill Piston Ring Company (St. Louis) and plaintiff was traveling representative for the Auto Parts Company and called upon her employer. Defendant was then Miss Beulah Moon; she later married Mr. Sleeper (now deceased) who was manager of the company for whom she worked. Plaintiff's family and defendant's family became quite good friends; visited each other. Plaintiff, in 1925 or 1926, commenced a business which he operated under the name of Driveaway Company. Under contracts with dealers he furnished drivers and delivered cars under their own power. In January 1928, the Driveaway Company was incorporated. While plaintiff was operating the Driveaway Company, defendant's husband became sick and was out of employment; plaintiff, to accommodate the family, put him on the payroll of the Driveaway Company at $50 per week for twelve weeks, although he rendered no service. Mr. Sleeper died about 1930. In 1931 defendant was working for a laundry; was having rather hard sledding. Plaintiff's Driveaway business was prosperous; he had begun to use trailers for delivery as

well as continuing the driveaways. In 1931 defendant went to the Driveaway Company as bookkeeper at $25 per week. At that time plaintiff was operating two companies, the Driveaway Company and the Convoy Company. Driveaway delivered Chevrolets and the Convoy delivered Fords.

In 1934 automobile companies commenced making their own deliveries to dealers and the Driveaway Company obtained the contract for exclusive delivery to dealers for Chevrolet vehicles shipped out of St. Louis. The Driveaway Company was then operating about 40 trailers of its own and about 75 on a rental basis. After the contract with the Chevrolet Company the driveaway feature of the delivery service was abandoned and deliveries were by trailer truck. November 21, 1934, the capital stock of the Driveaway Company was increased from $5,000 to $50,000; only $20,000 of the stock was issued. November 26, 1934, 20 percent of the Driveaway stock was issued to defendant. Plaintiff says that the stock to defendant was a gift because the Driveaway Company "was prosperous and had a bright future", and because defendant "was doing a good job of working hard, and I thought she was deserving it." Defendant denies that her Driveaway stock was a gift; she says that all of the additional stock issued was paid to the corporate treasury in cash and by *taking out accounts payable,* [440] that is, personally assuming liabilities of the company, and later paying these from dividends. After the stock was issued to defendant, plaintiff held 320 shares and defendant 80. After the stock increase of November 21, 1934, the Driveaway Company did not pay any dividends until December 1936, but from December 1936 to August 1937, dividends amounting to about $300 per share were paid and plaintiff's salary was increased to $1250 per month and defendant's to $625 per month.

The above reflects the relation between plaintiff and defendant when plaintiff commenced, early in 1937, operating under the name of Truck Equipment Company, then not incorporated. Plaintiff testified that he realized that the continued success of the Driveaway Company was uncertain because that company had only one customer, the Chevrolet Company of St. Louis. He said that there was a company in St. Louis equipping Fords with special bodies and axles, and that in January 1937, at the suggestion of the western manager of the Chevrolet truck division, he began the business of equipping Chevrolet chassis with special bodies and axles. The company was incorporated April 15, 1937, with a capital stock of 1,000 shares of no par value. The articles of incorporation recited that the company "shall begin business" with $20,000, paid up in cash and property. According to the articles, $10,000 cash was paid in and the property put in was valued at $10,837.78. Plaintiff had a 75 percent interest (750 shares) and defendant a 25 percent interest (250 shares) in the incorporated Truck Equipment Company. Two of plaintiff's shares, as we understand, were issued to a nominal

owner for qualifying purposes. All the stock, however, was issued to straw parties. Defendant was bookkeeper for the Truck Equipment Company and the Driveaway Company, and plaintiff was manager of these companies. Plaintiff had extensive business interests other than in St. Louis. He had interests in Ohio, Indiana and Texas, and after the incorporation of the Truck Equipment Company he commenced to spend more of his time away from St. Louis, and defendant commenced to manage both the Driveaway Company and the Truck Equipment Company. The assets of the Driveaway Company were sold in 1938 for about $85,000, in which plaintiff had an 80 percent interest and defendant a 20 percent interest. Plaintiff's interests outside of St. Louis were not successful. He frequently borrowed money from defendant and others. According to defendant, from June 1939 to March 1940, she made loans to plaintiff aggregating about $19,000, and in addition, she paid $2,080.72 federal income tax deficiency for plaintiff on the sale of the Driveaway assets.

Since defendant claims the purchase of plaintiff's stock in the Truck Equipment Company the burden was on her to establish such. So we first take up her side of the case. She alleged that in August, 1940, the Truck Equipment Company was losing money; that plaintiff was unable to pay his unsecured indebtedness to her, and that at the instance of plaintiff it was orally agreed between them that she would take all his stock in the Truck Equipment Company and release and discharge his unsecured debts to her and that such was done. She collected, as we understand, all of plaintiff's secured debts owing to her.

While defendant alleged that she purchased plaintiff's stock in August 1940, she testified that the purchase was subsequent to a letter (infra) which she wrote to plaintiff on August 9, 1940. She testified: "In January 1940, when he asked for a loan, I asked him what securities he had, and he said I could take his interest in the Lyndover property (real estate) or I could buy his interest in the Truck Equipment Company. I told him that I would rather have the Lyndover property. In March 1940, he returned and wanted more money; I asked him what his securities were and he again said, 'Take my interest in the Lyndover property.' I reminded him that he had given me that property as security on the original loan. Then he said, 'Well, take my interest in the Truck Equipment Company.' I said that I did not want the Truck Equipment Company; it was losing money continuously. So he said, 'Well, lend me $3,000 for a couple of months'; so I lent him $3,000 [441] at that time without any security. Then he came back (time not given) and borrowed $8,000; and then he asked for more. I said, 'Well, John, you haven't any more security, and you are going to lose the Carroll-Cartwright Corporation (Indiana) and I cannot see any need of me going broke just because you are.' And he said, 'Well, the Truck Equipment.

Company is certainly worth something', and that I should take his interest in that. So I let it ride for a little while. And I still gave him the money. And I assumed he would remember his statement to that effect and would do as he said. It looked very evident that he was going to lose his business in Indianapolis; I did not think that the $8,000 represented by the mortgage (on real property.) was too secure, so I wrote that letter (infra). He called me from Indianapolis, and instead of taking the letter as I had hoped he would, he seemed to take the attitude that I was trying to take something that did not belong to me. He said that I had the stock of the Truck Equipment Company, the mortgage, the quitclaim deed (on secured debts), and what more could I ask.''

Defendant was never definite as to *when* she purchased plaintiff's stock, except that it was after the letter of August 9, 1940, but her witness, Miss Agnes Seifried, who was secretary of the Truck Equipment Company, says that she issued the stock to defendant in September, 1940. Defendant further testified that when plaintiff ''returned from Indianapolis in April 1941 (after his losses there), he called on me in St. Louis. He came into the (Truck Equipment Company) office; looked bad and downhearted and talked to me about the whole thing. I said, 'Well, John, what are you going to do?' He said that he did not know. I said, 'I think the best thing for you to do is to get busy doing something; get your mind off the whole thing.' He said, 'Well, what?' I said, 'Well, you can come in here with me, can't you?' He said, 'No'; that he did not want to do that; I said, 'Why not? I have work for you; you can come in here on a sales commission proposition; I cannot pay you any great amount of money because the company is not making much; you can certainly sell and it will keep you occupied.' So he finally agreed to do that. He came back to the Truck Equipment Company to work, and from that time he continued in the employment of the Truck Equipment Company as a salesman until August last year'' (1945). This suit was filed December 20, 1943, so it would appear that plaintiff functioned as an employee (salesman) of the Truck Equipment Company about 4 years after defendant claims she purchased his stock and about 19 months of this time was after the suit was filed.

According to defendant and her witness Miss Agnes Seifried, as appears supra, plaintiff's stock in the Truck Equipment Company was issued to defendant *after* the letter of August 9, 1940, perhaps in September 1940, but the stock certificate was dated April 1, 1939, Miss Seifried, as stated, was secretary of the Truck Equipment Company when the stock was issued to defendant and filled out the certificate to defendant. She testified that defendant handed her the stock book and two filled out certificates; one to her (Miss Seifried) and one to William P. Murphy, and told her to fill out the certi-

ficate to defendant for 748 shares of plaintiff's stock. Defendant herself, as we understand, had written the "748" in the certificate. The stock certificates to Miss Seifried and Murphy were dated April 1, 1939, and Miss Seifried gives that as a possible reason for her inserting that date in the certificate to defendant for plaintiff's stock. And Miss Seifried testified that on one occasion after plaintiff had returned and was functioning as a salesman for the Truck Equipment Company, defendant was absent and that she (Miss Seifried) "went to plaintiff to seek his advice or direction in regard to some matter of business", and that plaintiff said to her that "it was Mrs. Sleeper's baby and I should take it up with her."

Another circumstance tending to corroborate defendant's claim of ownership of the stock involved is a financial statement plaintiff gave to the Second National Bank of Bucyrus, Ohio. This statement, signed by plaintiff February 20, 1941, purported to give plaintiff's assets and liabilities, but it did not list as an asset any stock [442] in the Truck Equipment Company, nor did it list as a liability any debt that he owed defendant. It seems that plaintiff sent his statement in blank to defendant and that she filled it out for him. She attached a typed note to the statement that there might be changes he would like to make, but no change was made so far as listing as an asset stock in the Truck Equipment Company or as a liability any debt to defendant. Also, it appears that after defendant had plaintiff's stock transferred to herself she obligated herself personally and pledged her own securities for large sums of money to carry on the operations of the Truck Equipment Company.

Plaintiff's evidence: August 9, 1940, defendant wrote (letter referred to supra) plaintiff at Indianapolis, Indiana, that in making an inventory of her properties to file in her safe deposit box, together with her will, she had discovered that she had no note or security for the balance plaintiff owed her, $5,713.89. The letter continues: "At the time you were making requests for money you asked me if I wanted Truck Equipment Company, at which time I said 'no', as I have always kept in mind that I would have approximately $35,000.00 cash and if invested I would have a set income, which there could never be any doubt about and I would not need worry. But your needs became so urgent I had to pass up my own wishes in order to help you out. So in order to have everything cleared up and put each of us in a clear position should anything happen to either of us I would like you to consider turning the Truck Equipment Company over to me as payment of balance due me.

"Now I want to be fair with you and I know you will be to me so in turning this stock over to me I believe, and I would much rather have an agreement drawn up between us that if and as soon as I realize profits from the Truck Equipment Company equal to your indebtedness to me that I turn over 50% of the Truck Equipment

Company stock to you and I retain the other 50%. We can then pay you back for the money loaned the Truck Equipment Company (which now represents the only cash value of said company).

"Your side of this agreement is that if Truck Equipment Company does not show enough profits to pay me the amount you owe me—or if I should lose money on the Lyndover property (your piece) you will (if you are financially able) take care of me on these losses. . . ."

Plaintiff testified: "I did not authorize defendant to take ownership to my stock in settlement of what I owed her in September 1940, or at any time. About December 1941, I heard that she was claiming ownership to my stock and asked her about it, and she said there was not a word of truth in what I had heard. She said she was holding the stock until my indebtedness to her was paid out. She said she had the stock in her lock box, and I wanted the stock returned to the safe in the Truck Equipment office. She said she would not do that until this debt was cleared. I then consulted counsel." The attorney consulted wrote defendant on December 9, 1941, that plaintiff had advised with him relative to the affairs of the Truck Equipment Company and his (plaintiff's) obligations to her; stated that he had advised plaintiff that there was no apparent reason why matters could not be adjusted and suggested a conference. Plaintiff testified that he was in the office when defendant received this letter; that she went into a tantrum; threatened suicide; said plaintiff would be responsible and that his family "would have that stigma on their hands." Plaintiff said that the next evening he and defendant had a conference by appointment at the office of the Truck Equipment Company "and arranged a working plan that satisfied me and her too." The plan was: "I was to continue on as I was doing (salesman for the Truck Equipment Company), and she was to continue on in the work that she was performing (managing the affairs of the Truck Equipment Company). She was to get $50 a week, and when the company got in liquid position to pay my note—to pay me off the money I had loaned them, then I would pay her and get the stock back." The note referred to, according to plaintiff was a $9,000 note of the Truck Equipment Company payable to the Driveaway Company. Plaintiff's interest in the note was 80 percent and [443] the remainder belonged to defendant. Plaintiff said that when this note was paid defendant was to return his stock, and that he did not then know that defendant "had transferred the stock" (had it issued in her name).

During the conference at which an agreement was reached, according to plaintiff, defendant typed a memorandum (not signed) of the agreement in fictitious names as follows: "Jane Adams and John Quincy has been associated in business for a number of years. They wish to draw up an agreement whereby Jane Adams will be

president of Adams, Inc. under a contract for a period of time unhampered as general manager of the Adams Inc. in the ordinary route of business. As president, Jane Adams to be clothed in authority of the president under the board of directors and by laws of the corporation. Dividends to be declared and John Quincy Adams agrees to pay Jane Adams his portion of the dividends until the indebtedness of John Quincy to Jane Adams is cleaned up. Jane to operate the business at a salary of $200.00 per month. Each to have equal representation on the board." Defendant says that plaintiff dictated the Adams memorandum; that he suggested the names J. C. Dolan and B. M. Sleeper; that she declined to write the memorandum in their names and that plaintiff then suggested the name Adams. She says that no agreement was reached; that they got into an argument and "ended up in both going home sick."

Plaintiff said that after the Adams memorandum which was in December, 1941, he continued to work as salesman for the company and defendant continued as manager until he thought earnings (his portion) had been sufficient to pay defendant whatever he owed her, and that he approached her about getting his stock back, and that she then, for the first time, said that she "owned the stock." Defendant says that she discharged plaintiff as salesman for the Truck Equipment Company because she received a complaint from one of her supply companies that plaintiff was selling merchandise of a competitor of this supply company.

Reid S. Ruggles was a traveling salesman; sold material to the Truck Equipment Company. Mrs. Ruggles frequently accompanied her husband and became acquainetd with plaintiff and defendant. Mrs. Ruggles was a witness for plaintiff and testified that she had known plaintiff and defendant for about 10 years; that shortly before plaintiff returned to St. Louis from Indianapolis in 1941, she had lunch with defendant in St. Louis; that they discussed the misfortunes of plaintiff in Indiana; that she (Mrs. Ruggles) said that she was glad that plaintiff "had the Truck Equipment Company here to fall back on"; that defendant said, "Well, he does not have the Truck Equipment Company to fall back on." And I said, "What do you mean, I thought Mr. Dolan owned the Truck Equipment Company"; that defendant said, "I own it." Then Mrs. Ruggles asked defendant if plaintiff knew that she (defendant) owned the Truck Equipment Company and that she said, no; that she had let him have a whole lot of money and that she was taking the Truck Equipment Company over.

William P. Murphy, at the time of his death which was prior to the time this cause was filed, was vice president of the Truck Equipment Company and defendant alleged in her answer that Murphy was present at the conversations between plaintiff and defendant which resulted in defendant purchasing plaintiff's stock for the considera-

tion of the release and discharge of his unsecured debts to her; that plaintiff delayed pressing his claim of ownership of the stock in question until after Murphy's death and until the company became prosperous, and was therefore guilty of such laches as to bar recovery, and the trial court so found.

The trial court made a finding of facts wherein it is stated: "He (plaintiff) had shown next to no concern as to the operation, management or welfare of Truck Equipment Company. His every resource was absorbed by other interests. Upon his return to St. Louis in 1941, he admittedly exercised none of the stockholder's rights conferred by the corporate by laws, and was finally discharged as a salesman for selling a line of products which conflicted [444] with a profitable line for which the company was distributor, which conduct on his part endangered the continuation of the distributorship contract. His conduct was not consistent with a claim of 75% ownership of the company. It was typically that of an employe, not that of an owner of a large and controlling stock interest. He asserted none of the rights of an interested owner, relegated himself to the role of salesman, and acted accordingly."

The trial court, in a statement of the grounds for the decision reached, made the observation that "the questions involved in this case are almost entirely questions of fact", and that is true, and that there are *two* sides to the case must be conceded, and the evidence is in irreconcilable conflict. But the trial court found for the defendant, and this being an equity case, is considered de novo on appeal. "In cases where there is irreconcilable directly conflicting verbal testimony, on fact issues, produced before the chancellor, it is our rule to defer to his findings thereon, because of his better opportunity to determine its credibility, at least, unless the overwhelming weight of the evidence appears to be against them." Green v. Wilks et al. (Mo. Sup.), 109 S. W. (2d) 859, l. c. 864; Fessler et al. v. Fessler et al., 332 Mo. 655, 60 S. W. (2d) 17, l. c. 23 and cases there cited. While defendant was many times equivocal and, as stated, was never definite as to *when* she purchased the stock, yet on the other hand plaintiff's conduct after he returned to St. Louis in April 1941, and became a salesman for the Truck Equipment Company, was wholly inconsistent with the notion that he owned 75 percent of the stock. Of this feature the trial court in its finding said: "In 1941, Dolan returned to St. Louis, having lost all, or nearly all of his means in his other enterprises. He returned to work for Truck Equipment Company as a salesman on commission, but asserted none of the rights which he could have exercised as a majority stockholder. He never saw or asked to see the books after 1940, though he might have demanded that right had he been a stockholder; he did not ask that any stockholders' or directors' meeting be called, though that right was

conferred by the bylaws; he neither asked for nor asserted any of the functions of management or of any owner.''

As stated, the trial court found not only that the sale of the stock was made as claimed by defendant, but also found that plaintiff was by his laches and conduct estopped to assert title to the stock. We do not rule that issue. It is sufficient to consider plaintiff's delay and conduct in taking employment by the Truck Equipment Company as circumstances tending to support defendant's claim of purchase.

While defendant's case is not in all things entirely satisfactory, yet under the due deference rule, the record is not such as would justify overturning the finding of the trial chancellor. The judgment should be affirmed and it is so ordered. *Dalton* and *Van Osdol, CC.,* concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.