260 S.W.2d 31 (1953)
STOUSE
v.
STOUSE et al.
No. 7103.
Springfield Court of Appeals. Missouri.
June 2, 1953.
*32 James H. Keet, Jr., Springfield, for appellant.
Sater & Monroe, Monett, for respondents.
McDOWELL, Judge.
This action is to determine the interest of the parties to property acquired by them in the operation of a tavern and cafe business in Monett, Missouri. The cause was tried before the court and judgment rendered for defendants. Plaintiff appealed.
The petition is in three counts. The first count alleges that plaintiff and defendants are tenants in common of a certain tavern and cafe business in Monett, operated under the name "Fred & Lee Cafe". It states the business consists of a lease on the premises and a valuable stock of goods (describing them), together with certain cash.
The petition states that plaintiff and defendant, Fred Stouse, started operating this business in May, 1947; that in May, 1948, defendants, H. L. Stouse and June Stouse, purchased a one-half interest in the business and joined in its operation.
The petition states that plaintiff and Fred Stouse, each, owned an undivided one-half interest in said business and now own such interest subject to the rights of the defendants, H. L. Stouse and June Stouse; that plaintiff and the defendants have, since *33 July, 1948, contributed to and withdrawn certain amounts of cash from the business. It then alleges that the business has a value, not only for the goods and property in it, but for the good will thereof and states that no division of the assets and good will can be made without great loss to the owners and asks that the assets be sold and the proceeds divided between the parties according to their respective interests.
The petition sets out the different agreements between the parties as to how they acquired their interest in the business and asks that such interests be determined by the court and pleads that plaintiff has no adequate remedy at law.
The prayer asks that the assets be partitioned and sold and divided among the parties according to their interests therein.
The second count alleges that this business owned a 1948 Hudson automobile, now in possession of defendant, Fred Stouse, and asks that the parties' interest be determined as to this property.
The third count seeks the same remedy as the first and second counts as to certain personal property therein described.
Defendants' answer is a general denial.
In our opinion we will refer to the appellant as plaintiff and to the respondents as defendants, being the position they occupied in the lower court.
The judgment of the trial court was for the defendants.
We think the only question involved in this case is presented by plaintiff under her first assignment of error which reads as follows:
"Appellant's evidence made out a case of joint adventure, first with her husband, then with him and her son."
Under this assignment of error plaintiff cites Brooks v. Brooks, 357 Mo. 343, 208 S.W.2d 279, 4 A.L.R.2d 826.
The law on the question of "joint adventure" is clearly stated in this case, 208 S.W.2d on pages 283, 284. We quote:
"Sufficient for the purposes of the instant case, the authorities hold a husband may by an express agreement with the wife relinquish his common-law rights to her earnings. Ex parte Badger, 286 Mo. 139, 143(1), 226 S.W. 936, 937(1) [14 A.L.R. 286]; Dunifer v. Jecko, 87 Mo. 282; Warren v. Davis, Mo.App., 97 S.W.2d 159, 162 (1); Annotation, L.R.A.1917E, 282; 41 C.J.S., Husband and Wife, §§ 17, 130, 258; 27 Am.Jur. 66, § 468. Defendant's cases recognize the rights of the wife where there is an understanding with the husband that she is to have the fruits of her labor. Plummer v. Trost, 81 Mo. 425, 428; Hendricks v. St. Louis Transit Co., 124 Mo.App. 157, 101 S.W. 675.
"Plaintiff's cause of action proceeded upon the theory of an express agreement between the husband and wife for the conduct of a joint adventure. `A joint adventure has been aptly defined as a special combination of two or more persons, where in some specific venture a profit is jointly sought without any actual partnership or corporate designation, or as an association of persons to carry out a single business enterprise for profit, for which purpose they combine their property, money, effects, skill, and knowledge.' 48 C.J.S., Joint Adventures, § 1; Neville v. D'Oench, 327 Mo. 34, 59, 34 S.W.2d 491, 503(1, 2); Denny v. Guyton, 327 Mo. 1030, 1053 et seq., 40 S.W. 2d 562, 570(6-14); State ex rel. McCrory v. Bland, [335] Mo. [706], 197 S.W.2d 669, 672(3-5), 168 A.L.R. 929. Among the observations quoted with approval from Corpus Juris by court en banc in Denny v. Guyton, supra, 327 Mo. 1030, 40 S.W.2d 562, 570, are:
"`* * * "Whether the parties to a particular contract have thereby created, as between themselves, the relation of joint adventurers, depends upon their actual intention, which is to be determined in accordance with the ordinary rules governing the interpretation and construction of contracts." * * * "Any person legally competent to contract may become a party to a joint adventure." * * * "In the absence of statutory provisions to the contrary the contract may be oral or written. * * * The agreement is not rendered invalid by any uncertainty in the duration of the business or indefiniteness in the minor details of the adventure. * * * The mutual promises of the parties to a joint adventure *34 are a sufficient consideration to support their contract." * * * "Within the scope of the enterprise they stand in a fiduciary relation each to the other, and are bound by the same standards of good conduct and square dealing as are required between partners."
"`* * * But it may be said of the great majority of such agreements that they do not point out precisely what each party is to do under them. * * * And the contract is not avoided for indefiniteness because the minor details are not fully established. * * * Decisions defining and describing partnerships are not controlling upon the question of whether the parties to the agreement were joint adventurers.' See also 48 C.J.S., Joint Adventures, §§ 2, b; 3; 5, b.
"`A preponderance of the evidence is necessary and sufficient to prove a joint adventure.' 48 C.J.S., Joint Adventures, § 12, note 61. This is in accord with the approved quotations from Corpus Juris by the court en banc in Denny v. Guyton, supra. * * *" Ewalt v. Hudson, Mo.App., 223 S.W.2d 132, 134, 135.
In passing upon this assignment of error we review the record and reach our own conclusion as in an action in equity. Bussinger v. Ginnever, Mo.App., 213 S.W. 2d 230.
Of course, deference is accorded to the findings of the trial court where there is conflicting evidence, unless the appellate court is satisfied that the findings of the trial court are against the weight of the evidence. Schneider v. Johnson, 357 Mo. 245, 207 S.W.2d 461; Kingston v. Mitchell, Mo.Sup., 117 S.W.2d 226; Dolan v. Truck Equipment Co., 357 Mo. 1034, 212 S.W.2d 438.
The evidence in the case shows that defendant, Fred Stouse, is plaintiff's ex-husband and defendant, Lee Stouse is her son, and June, her daughter-in-law. The testimony shows that plaintiff and defendant, Fred Stouse, had been married about 35 years; that they moved to Lebanon about 1934, after their family was grown, and both of them began to work outside the home. Plaintiff testified that for about seven years she made the living for the family by laundry work in the home and she kept boarders in road camps and saw mill camps. She stated that in the years prior to the purchase of the tavern in question, most of her money was taken for home expenses. The record shows that she and her daughter operated a restaurant in Lebanon and that plaintiff had a separate bank account from her husband and at the time the tavern in question was purchased, plaintiff had $300 in her bank account and had purchased the household furniture with her own earnings which, by agreement between the parties, was sold for $500 at the time the parties left Springfield to take charge of it. While the evidence is not clear as to how much of plaintiff's money was used, a reasonable inference to be drawn therefrom is that plaintiff's money and the household goods and her husband's money was used in part payment for the tavern purchased.
While the parties lived in Lebanon they both worked for others. A part of the time they worked in the same tavern and a part of the time they worked in different places. Plaintiff's husband, at one time, owned an interest in a tavern in Lebanon and had a beer license in his name, but most of the time they worked for other people.
Plaintiff gave this testimony:
"Q. Had your husband and you ever discussed at any time purchasing a tavern? A. We had.
"Q. When was that? A. Well, back inafter him and I came out of the Chicken Shanty cafe we owned. We both went to work. He went to work for a tavern and I went to work in a cafe till my job played out. The man sold and I worked in the tavern with him and
"Q. Let's get back to your first discussion. What month and year was that? A. I would say about '46, between '45 and '46.
"Q. Where did that discussion take place? A. In our home.
"Q. What was said by you and your husband at that time to each other in regard to purchase of a tavern? A.

*35 We discussed that we would work and save our money so we could be able to buy one of our own."
She stated they agreed that she would use her money in paying household expenses and her husband would save his money so they could buy a tavern. She testified that after that her husband paid the rent and she paid the balance of the household expenses. She stated she was making around $25 a week.
Plaintiff testified that when the first discussion came up about buying the tavern in Monett, her husband had $1,200 in one bank and $2,000 in another bank and she had $300 in her bank account and that she owned the household and kitchen furniture, paid for by money earned from her work.
Plaintiff gave this testimony:
"A. After we got out of business in Lebanon or working for the other party too we started hunting for a place to buy for ourselves. We had looked at Mansfield, Mountain Grove and Cabool and they were all priced too high and came back to Springfield and I taken sick suddenly and went to the hospital first day of April, came back to my daughter's and one night about ten o'clock my daughter's daddy-in-law came in and he lived in Monett at the time, and he asked if we would be interested in buying a place in Monett and we told him we would."
Plaintiff testified that her husband went to Monett with her daughter's father-in-law to look at the tavern; that no sale was made on this trip. She gave this testimony:
"Q. What discussion, if any, did you have with your husband when he got back from that trip? A. He was quite interested in it and told me all about the tavern and the next time my daughter and son-in-law went with him to Monett.
"Q. Did they come back from Monett after that trip? A. They came back that late evening or night and explained about all of it.
"Q. Where was that now they told you about it? A. At my daughter's house.
"Q. Was there any discussion in regard to financing the place? A. Yes, he said that we didn't have enough.
"Q. By `he' who do you mean? A. My husband. Said we wouldn't have enough, that we would have to put a mortgage or leave the mortgage that was on, transfer it over to us, $1,200, and it would take everything we had even to selling the furniture to get started.
"Q. Was there any discussion at that time as to who would do the work in the tavern? A. Well, both of us.
"Q. What discussion was there? Who said what about who would work there? A. Fred told me I would have to take care of the kitchen. It wasn't operating but he thought it would do better if it would and he would turn the kitchen over to me, the buying and the cooking."
Plaintiff testified that on the last trip her husband paid Johnny $250 to hold the deal until they could go to Monett. She stated she went to Monett with her husband and, there, signed a mortgage for $1,200, payable to Lyle Leese, then against the place. She gave this testimony:
"Q. Did you sign it? A. I did.
"Q. Did Mr. Johnson, the then owner, sign any papers or give you any papers of any kind? A. He gave us a bill of sale, bill of sale to the place.
"Q. Where was all that done? A.
In Emory Medlin's office."
She testified that the place was bought on the second of May; that she went down May 7th and they started operating May 8th.
This witness stated that Fred's brother, Earl and his wife, Millie Stouse, had talked to them in Lebanon about going into a business with them and that they did put $800 into this business and that Fred had trouble with his brother and in about six weeks they borrowed $800 from Doc Reid and bought Earl's interest out. She testified that both she and her husband signed the note to Mr. Reid with which to buy out the interest of Fred's brother.
*36 We think the testimony is undisputed that the parties established a joint bank account and that plaintiff made the deposits from the money of the business in this account and did most of the buying for the business and writing checks on the account up until the time their son and his wife came in and that after defendants, H. L. Stouse and wife, purchased an interest in the place, plaintiff continued to keep the books, cook for the customers, work at the bar, make the income tax return and pay the bills. However, the bank account was changed to the name of the new firm established but all of the parties were given the right to check on the account.
There can be no doubt from the evidence in this case that plaintiff did the greater part of the work in operating this business and it was due to her efforts, largely, that the business prospered up until the time her husband told her to leave in 1950. There is no doubt that she signed all papers where money was borrowed to pay for the business and that she was consulted and did take part in borrowing the money for which the business was paid. The evidence shows that many improvements were made on the property and all of the articles named in plaintiff's petition were purchased out of the proceeds of the business. The notes given for the purchase price of the business were all paid from the proceeds of the business and the evidence shows that after defendants, H. L. Stouse and wife, purchased an interest, in the spring of 1948, there had been two pieces of real estate purchased and paid for out of the proceeds of this business.
Plaintiff gave this testimony:
"Q. Going back to the time when you were figuring on buying this tavern; did you and your husband have any discussions as to who would have charge of the place? A. We both were to have charge.
"Q. When you and your husband were figuring on buying the place, what discussions, if any, did you have as to how the profits and losses would be shared, if at all? A. We discussed the place was run down, didn't have very much business when we went down there, and he said, `It's going to be a tough row for both of us. We'll have to get in and work, build our business up, and it's a good gamble whether we make good or otherwise.'
"Q. Did you have any other discussion in regard to who would share the profits and losses? A. We both would. We were in it together."
The witness testified they spent $1,200 or $1,500 the first year they were there before Lee came.
We think it is unnecessary to set out the testimony regarding the different items set out in the petition, and in each count thereof, for there is no dispute in the testimony that all of the property was purchased from the profits out of the business. There is no dispute in the evidence that all of the indebtedness was paid from the profits of the business. There is no dispute that the liquor license was taken out in the name of Fred Stouse.
We think the testimony is undisputed that plaintiff did the corresponding with defendants, H. L. Stouse and wife, with reference to selling them an interest in the business and getting them to come back and help run the same. Plaintiff and her husband offered to give him a one-half interest but this was not accepted and he agreed to pay $4,000. This amount was to be paid out of the earnings of the business. There is some dispute as to how much of the purchase price of this interest has been paid. Plaintiff testified that about $500 had been paid on the $4,000, but defendants, Lee and June, claim to have paid approximately $3,000.
After Lee and June came into the business the name of the tavern was changed to "Fred and Lee's Cafe". The liquor license was changed to both Fred and Lee. Plaintiff gave this testimony:
"Q. Before Lee came was there a separate bank account? A. Before Lee came the bank account was in mine and Fred's name.
"Q. Where was that? A. Gillioz Bank."
She testified this bank account had $600 in it when Lee came. She stated that in November, 1950, she quit work because *37 they told her to leave; that that was the last she had to do with the business; that she had tried to get them to pay her her part and they had refused.
On cross-examination, when asked if her work at Monett was any different from what she had always done, plaintiff stated that it was; that she had placed her name on a lot of notes and had become obligated and she was in it to make a profit. Then she gave this testimony:
"Q. As the wife of your husband you were trying to help make a living, weren't you? A. I had an interest in it.
"Q. Your interest was in making a living, wasn't it, attempting to accumulate some property? A. I had an interest in the place and I was working to that end.
"Q. Just what was that interest? A. I felt I was half.
"Q. You thought you were half? A. I figured I was half owner and I had the responsibility of buying and selling and firing and hiring and I was part of the establishment."
This witness testified that Fred wrote checks while they were in Lebanon on his business but he never wrote checks on the business in Monett.
Fred Stouse testified that he was the former husband of plaintiff; that he first talked to Johnson about buying the tavern at Monett in the presence of his son-in-law's father. He stated he first offered $5,000 for it but did not close the deal on the first trip. He stated on his second trip his son-in-law and daughter were with him and that he didn't close the deal at that time but paid $250 to hold the deal. He testified that at that time his wife was in Springfield. He gave this testimony:
"Q. Did you talk to her during these negotiations? A. Probably did, yes. * * *
"Q. When did you finally close the sale? A. Well, it would have to be along the first of May. I don't remember the date.
"Q. Was it done at Monett? A. Yes, sir.
"Q. Did your wife go down with you at that time? A. At the time we closed the deal she was down there, yes.
"Q. What did you pay for the tavern? A. $6,000.00."
The witness testified that there was $1,200, secured by a mortgage, against the property and he assumed this debt. He stated he didn't think there was a new chattel mortgage made. He testified he gave $1,000 in cash on the State Bank of Lebanon. He then gave this testimony:
"Q. Did your wife pay any of it, any of that purchase price at the time you closed this sale? A. I just don't remember of it. * * *
"Q. And your wife was there at the time you opened up the business? A. That's right.
"Q. I believe your wife kept the books for the business? A. That's right."
The witness testified he wasn't capable of keeping a set of business books; that his wife wrote the checks on the account in the bank. He testified that his brother had $800 in the business for wages for himself and wife and for money furnished. He stated that when he bought his brother out he borrowed $800 from Doc Reid. He testified this indebtedness was repaid out of the business. He testified that Lee and his wife came down sometime in 1948 and that he told Lee they would work on a fifty-fifty basis; that his wife wrote two or three letters to Lee, making the arrangements for him to come back and Lee called and talked to his wife over long distance telephone. He admitted that he told Mr. Forsythe that he would like to get a settlement with his wife and give her what belonged to her but he said there was nothing said about how much she owned. This testimony was given:
"Q. You did not say to him at that time that your wife owned a half of what you had? A. I don't, think we had that kind of talk at all."
*38 On cross-examination, Fred Stouse testified that at first the bank account was in the name of "Fred's Cafe". This testimony was given:
"A. You mean did we have a joint bank account there?
"Q. Yes. A. I don't think so. She done the check writing but my name were on the checks and wrote `by wife' or something like that.
"Q. Do you deny that her name was on the bank's records as being named as an owner? A. Well, if her name was on it, I don't remember it on the banking account because I never wrote no checks. She done the check writing all the time.
"Q. Who opened up that account? A. Well, now she might have deposited the money, I wouldn't know.
"Q. Did she go to have it opened? A. I guess she took money and deposited in my name.
"Q. You don't know how it was set up on the bank books? A. No, I didn't even keep books.
"Q. You say when you got back from Monett from discussing that deal with Johnny Johnson and before you bought the cafe, your wife didn't say anything about it? You testified she didn't have anything to say about it. A. I just don't recall what she had to say about it.
"Q. You said she didn't say anything about it; now you say you don't recall. A. Probably we talked about it. I told her, I guess, I had bought it or something like that. * * *
"Q. Didn't you tell your wife that you would have to have both your funds and their funds in order to be able to pay for it? A. I don't remember that conversation.
"Q. Didn't you tell your wife that they would both have to work together and she would take over the kitchen and you would work together in order to make a go of it? A. I don't remember that conversation."
The witness then testified that his wife did the cooking, worked at the bar, did the cleaning and washing dishes, helped in the buying and general operation of the tavern and then gave this testimony:
"Q. Had you and your wife ever discussed buying a tavern before you ran into this deal at Monett? A. We had."
He then stated that they had looked at other taverns and he and his wife had talked about the matter of buying a tavern a year or two before they bought this tavern; that they had gone to other towns to look at taverns. He admitted that prior to the purchasing of the tavern, his wife had worked out and used the money in paying the living expenses of the family and then gave this testimony:
"Q. Your wife didn't put in anything? A. If she did, I have got no recollection of it now.
"Q. You remember the furniture which she had bought with her earnings up at Lebanon while you were gone? A. She bought that herself.
"Q. Yes, she bought it herself, didn't she? A. And paid for it * * *
The witness testified that if his wife paid part of the purchase price it was not very much.
"Q. By `very much' how much do you mean? A. Well, I wouldn't say but it wouldn't be no big amount at all because I practically had enough to cover it myself when I bought it.
"Q. As much as $300.00? A. It could have been.
"Q. When was that furniture sold that she had bought with her earnings? A. Well, the furniture you're referring to was sold just before we came to Monett.
"Q. Didn't the proceeds from that furniture go into the purchase of the tavern? A. Well, it could have and it could have went into something else."
The witness first testified that the bill of sale to the tavern was taken in his name, *39 then he gave this answer: "If there was a new bill of sale drawed on that, I don't have no recollection of it. * * *"
The witness said he thought that a bill of sale to the property, held by Johnson, was merely assigned to them and he stated he didn't know what had become of the bill of sale. In speaking of the $1,200 that was assumed, this witness testified:
"Q. Was a new chattel mortgage drawn up at that time? A. You mean to Mr. Leese?
"Q. To Mr. Leese, yes, sir. A. I just don't believe I would try to answer that. If I am clear in my mind, there wasn't."
The witness had testified before, in a deposition, that there was no new chattel mortgage made but he testified now that he did not know. He admitted that his wife might have signed the note to borrow the money from Doc Reid to purchase his brother's interest in the business. He testified that the real estate, purchased and paid for from the proceeds of the business, was purchased after his son and wife came in 1948.
In a deposition given by this witness, he testified that when Lee and June came, the understanding was that they were to have a half interest in the business. They all lived out of the place, all four of them worked and this question was asked:
"Q. In other words you considered Lee in the same category as your wife? A. Yes."
The witness testified that a refund check came back from the income tax department on this business and he and his wife split it equally.
Mrs. Robert Talley, daughter of plaintiff and Fred, testified that she was present when her father first went to see the tavern; that her mother was, at the time, at her home sick. She testified that she and her husband and Fred, her father, went to Monett, looked at the place and got the details of how it could be bought from the owner, Mr. Johnson; that he asked $6,000 for the property. She testified that her mother and father had been looking for a tavern to buy for several months and that she had heard them discuss the matter; that on their return to her home in Springfield, her father told her mother all about the transaction, described the building and the lease and discussed how they could pay for the same. She gave this testimony:
"Q. Did he say anything as to how it could be financed? A. He said it would take all of their money to finance it and they might have to borrow some from his brother."
She testified that she knew both her mother and father had separate bank accounts. She corroborated her mother's testimony as to her working separately from Fred and running separate businesses and having separate bank accounts. She testified as to the work her mother did in the business.
June, Lee's wife, testified that when they were in California, the only conversation as to the purchasing of an interest in the tavern was the letters written to Mom for Lee about her offer. She gave this testimony:
"Q. That was all settled on the basis your mother-in-law had written Lee? A. That's right. * * *"
She testified they didn't have the money at the time but that Lee had told his mother he could not accept less than a half interest in the business and that they would have to pay out of the business. She stated she didn't hear any conversation between Fred or Lee or plaintiff as to what interest each of them were to have.
Lee gave this testimony on cross-examination:
"Q. Isn't it a fact that it was mutually agreed by all of you that each family would have 50 per cent interest? A. Yes, sir."
This was the testimony, we think, given to show the interest of the parties in this lawsuit.
Viewing all of the evidence in the case at bar, in the light of the law as herein set out, we find that a joint adventure was entered into between plaintiff and her ex-husband, Fred Stouse, for the purpose of purchasing and operating a tavern in Monett, *40 Missouri, for profit, for which purpose they combined their property, money, effects, skill and knowledge.
The testimony shows that plaintiff and Fred Stouse were married about 35 years and raised a family; that about 1934 they moved to Lebanon, Missouri, and the evidence shows that thereafter each of them worked for others for hire. Plaintiff cooked in sawmill camps, worked in restaurants and, with her husband, for different individuals, in taverns. The testimony shows that at one time defendant, Fred Stouse, owned an interest in a tavern, while in Lebanon, and had a beer license in his own name; that after he sold this business he and his wife both worked for salaries for others in a tavern. The testimony shows that during this period of their married life, each of them had separate bank accounts; that they finally concluded in 1945 or 1946 they would go into business together and buy a tavern of their own and there is no dispute as to the evidence that they discussed the proposition of going into business for themselves and, shortly before they moved to Springfield and while in Springfield, they, together, made visits to different places to try to buy a tavern.
The evidence then shows that some of their relations came over from Monett to plaintiff's daughter's home where plaintiff and her husband were at the time, in Springfield, and told them about the tavern of Johnny Johnson in Monett being for sale.
Now there is no dispute as to the evidence that Fred Stouse went, in company with his daughter's father-in-law, to Monett to see about buying this tavern. There isn't any question that this proposition was talked over between all of the parties before Fred made his first trip to Monett. There, while on the first trip, Fred ascertained what the price of the business would be and the details concerning the amount of property. He made a second or third trip to see about buying the property with his daughter and son-in-law and the testimony, on the part of the daughter and of the plaintiff, shows that before the purchase was made, he returned to Springfield, to the home of his daughter, and there discussed with his wife the details of buying this property. Plaintiff and her daughter testified that he there told his wife they could buy the property for $6,000 and they would have to put in all of their assets and borrow money to finance the operation. They discussed what each of the parties would do in the operation of the business. Plaintiff was to open up a restaurant, which had been allowed to be discontinued in the business, and was to do the cooking and each of them was to contribute their labor to the building up of the business. We think there is no conflict in the testimony that at the time of this purchase, plaintiff had $300 cash in the bank and had purchased the household goods out of monies she had earned while working for others and that these household goods were sold for $500. Defendant had two separate bank accounts, according to the evidence, and the combined assets of both parties were used in the purchase of this business.
Plaintiff states that when they first discussed going together and buying a business or tavern of their own, it was agreed between them that each of them would work out and that she would use her money in paying the household expenses and that Fred Stouse would save his money to pay on the business and that that was done for a long time before the purchase. She testified Fred Stouse paid the rent but that she paid all of the other household expenses.
Defendant, Fred Stouse, does not deny this testimony and he does not deny that a part of plaintiff's money went into the purchase of this business. He says that he does not remember how much of plaintiff's assets were used in the buying of the business but that it was not very much. When asked if they did not sell plaintiff's household goods for $500, when they bought this business, defendant Stouse admitted they did and then said that maybe the money was used for the purchase of the business and maybe it was used for something else.
We think the evidence conclusively shows that a new chattel mortgage was made to replace a mortgage against the property when bought and that both plaintiff and her husband signed the note and mortgage. We think the evidence conclusively shows that *41 a bill of sale was made from the seller of the tavern to plaintiff and her husband, jointly. The evidence conclusively shows that they borrowed $800 to pay defendant's brother's interest in said property when bought; that both plaintiff and her husband negotiated for this loan and both signed the note. The evidence conclusively shows that the bank account was in their joint names and that plaintiff started the bank account, made all the deposits, kept the books for the business, hired and fired the help and was the chief factor in the operation of this business which made it a success.
Now plaintiff testified that she and her husband entered into this business together to make a profit and each was to own a half interest therein. This, defendant denied. He contends that his wife was only doing her part as his wife.
Defendant relies a great deal on the fact that the liquor license was bought in his name. We submit that in Brooks v. Brooks, supra, decided by the Supreme Court, there, the liquor license was purchased in the name of Vernon Brooks, and, yet, the court held that there was a joint adventure.
Sometime in April, 1948, plaintiff and her ex-husband sold a half interest in this business to their son and daughter-in-law, Lee and June Stouse. The evidence conclusively shows that this sale was the sole result of letters written to California by plaintiff. The purchase price was to be $4,000 and was to be paid from the profits of the business. The testimony shows that after these parties came into the business, the bank account was changed to the new firm name of "Fred and Lee's Cafe", but that each of the parties were to have the right to check on this bank account as they wished. Even the son admits that he considered his mother had an interest in the business.
The evidence shows that all the indebtedness on this business was paid from the profits of the business; that the automobile, now in the possession of defendant, Fred Stouse, as mentioned in the petition, was paid for out of the assets of the business; that all of the improvements and personal property purchased for the operation of this business, was purchased from the profits of the business and even two pieces of real estate, of which the petition does not cover, purchased by Fred and his son after plaintiff ceased to assist in the operation of the business. They do not deny that plaintiff demanded that they pay her for her interest.
We find that a contract of joint adventure was made and entered into before and at the time this business was bought by plaintiff and her ex-husband, when they combined their assets and gave their notes and mortgages to pay for the same. Certainly, the sale to the son and his wife had nothing to do with the joint adventure. That sale only is competent to shed light on the intention of the parties by their acts but the contract of joint adventure was entered into between the plaintiff and her husband, Fred Stouse, when this special business was purchased.
A joint adventure can only arise by contract, but the contract may be established without any specific or formal agreement. Denny v. Guyton, 327 Mo. 1030, 40 S.W.2d 562.
This contract was quite positively established by plaintiff's testimony. She stated that she put her money into the business; that they had, sometime before, agreed to go together and establish a joint business; that they were saving their money for this purpose; that she was to have a half interest in the property and she was entering the joint enterprise for profit. She testified that each was to contribute their work and labor, money and effects and that they did do that. The testimony fully sustained that contention. Fred Stouse is indefinite in his testimony. He says a part of his wife's money might have gone into the business. He admits that she was the moving factor in the operation of the business. He admits she established the bank account, kept the books, and contributed her labor to the success thereon. He first testified that the bank account was in his name and then admitted he did not know. He then testified that the bill of sale was in his name and then admitted that he didn't know whether there ever was a new bill of sale made and said he believed that the bill of sale of Johnny Johnson was merely assigned to *42 them. He had no records to show anything about his business for he had left it all to be done by his wife.
Under the facts and circumstances in this case we think the evidence establishes a joint adventure for the specific venture of buying and operating a tavern for profit, jointly between these parties. It was a contract to carry out a single business enterprise for profit, for which purpose plaintiff and Fred Stouse, her then husband, combined their property, money, effects, skill and knowledge. Brooks v. Brooks, supra, 208 S.W.2d at page 283 and cases cited therein; Ewalt v. Hudson, supra, 223 S.W.2d at page 135; Kingston v. Mitchell, supra; Dolan v. Truck Equipment Co., supra.
There is a conflict of evidence as to how much money defendants, Lee and June Stouse, have paid on their half of the purchase price of this business. Under the evidence in this case plaintiff is entitled to one-half of all of the assets of this business and its good will and all the property purchased from the profits thereon, save the one-half interest sold to Lee and June Stouse, and this plaintiff is entitled to a half of whatever is due, if anything, on the sale to Lee and June.
Cause reversed with directions that the trial court permit plaintiff to amend her petition, if she desires, and include the real estate purchased from the profits of the business, and that the court have an accounting made between the parties to determine the interest of plaintiff, according to this opinion.
VANDEVENTER, P. J., concurs.
BLAIR, J., concurs in separate opinion.
BLAIR, Judge (concurring).
A more careful study of the record has convinced me that, while a contract of joint adventure can be based only upon a contract, the contract itself need not be established by a formal written agreement between the parties.
In the case of Denny v. Guyton, cited in the majority opinion, the Supreme Court of Missouri, through Atwood, J., has said [327 Mo. 1030, 40 S.W.2d 571]:
"It" (a joint adventure) "can arise only by contract or agreement between the parties." He further said, "But joint adventure may be established without any specific formal agreement to enter into a joint enterprise; it may be implied or proven by facts and circumstances showing such enterprise was in fact entered into."
The majority opinion has missed the significance of Brooks v. Brooks, 357 Mo. 343, 208 S.W.2d 279, 4 A.L.R.2d 826. The point in that case is correctly interpreted by the Reporter of that opinion in the first paragraph of the syllabus, when the Supreme Court is said to have held that, in actions between husband and wife, the wife was a competent witness against the husband as to business conversations between them, in the absence of third persons, and that she could testify to all of the facts which she claimed tended to show that a joint adventure actually existed.
With such formerly inadmissible testimony out of the way, the fact of a joint adventure was sufficiently established by the entire weight of the evidence. Such oral contract had previously been held to be sufficient.
I have come to the conclusion that, while the establishment of a contract of joint adventure is necessary, such contract may be established by the weight of competent oral evidence and need not be in writing.
This case was originally assigned to me. I felt that, while plaintiff should be permitted to recover, if possible, the trial court had assumed that a contract of joint adventure must have been definitely established. As I stated in my former opinion, I heartily sympathized with plaintiff and felt that she had permitted her blind marital duty to her husband to cause her to devote her own energies to his success, without any contract of joint adventure.
The reversing of the judgment in this case, with directions to the trial court to take an accounting between plaintiff and other parties in this cause to determine what, if any, interest in the Monett Tavern *43 plaintiff may have had, meets with my approval.
Whether plaintiff has otherwise been properly and sufficiently provided for in the divorce case between plaintiff and defendant Fred Stouse should also be determined by the trial court.
I concur in the result reached in the majority opinion.