**SCOTT   v.   KEMPLAND et al.**

No. 43490.

Supreme Court of Missouri.
Division No. 1.

Jan. 11, 1954.

Motion for Rehearing or for Transfer to
Court En Banc Denied Feb. 8, 1954.

Joseph Boxerman, Joseph Nessenfeld, St. Louis, for appellants.

Jerome F. Duggan, Edward A. Dubinsky, St. Louis (Dubinsky & Duggan, St. Louis, of counsel), for respondent.

DALTON, Judge.

Action at law to recover one-third of the net profits realized from the purchase and sale of a tract of real estate in the City of St. Louis. Plaintiff alleged that he and defendants purchased the described real estate; that the "property was sold for the joint account of plaintiff and defendants at a profit of $25,000," which profit was to be equally divided between the parties, but that the defendants collected and retained the said sum and refused to pay plaintiff his share. Plaintiff asked judgment for $8333.33 and interest. The cause was tried to the court without the aid of a jury and judgment was entered for plaintiff and against the defendants for $9533.-30. Defendants have appealed.

No questions are raised concerning the sufficiency of the petition or the amount of the judgment, but defendants-appellants insist that plaintiff failed to make a submissible case, and the court erred in finding for plaintiff. The essentially disputed question is whether plaintiff and defendants engaged in a joint adventure for profit under which the property was purchased

and sold for the equal benefit of each of the three adventurers.

The defendants, Watson and Kempland, were independent real estate brokers, each maintaining an office in the City of St. Louis. They frequently purchased and sold real estate together. Plaintiff Scott was also a real estate broker in Watson's office. He had had no previous dealings with either Watson or Kempland in which he was a partner in the purchase of real estate.

For some time prior to May, 1947, the real estate located at 2014–2020 Delmar Boulevard in St. Louis was on the market for sale at an asking price of $175,000. It was owned by McRoberts and Richardson. Richardson, a friend of Watson, had submitted a statement on the property showing its price and rental and other relevant facts, and Watson had given out copies of the statement in 1946 to a number of brokers and other persons, including Kempland and Scott. The property was occupied at the time under lease by the Majestic Stove Company and one of the questions affecting the sale of the property was whether the lessee would continue its occupancy.

In April, 1947, Kempland heard that Richardson was very anxious to sell the property, and another real estate man told him that it was his understanding that the price had been reduced to $87,500. Kempland reported this conversation to Watson, stating that he would be interested in purchasing the property at that figure. He asked Watson to find out for him what the facts were as to the price and also about the possibility of cancelling the Majestic lease. Watson learned that the lease was to be given up. He then conferred with Richardson, who asked $100,000 for the property, but subsequently told Watson that he would take the sum of $90,000 net cash. Watson reported this conversation to Scott but, apparently, did not report it at the time to Kempland.

Scott testified that Watson asked him whether he would be interested in purchasing the property with him (Watson) at $90,000. Scott "studied the matter over" and agreed that he would do so on the basis that the property should be equally divided between them. It was agreed that both of them would then see if they could make a profitable disposition of the property.

In a deposition prior to the trial, Watson testified that he told Scott before Scott got an offer from Bennett, as hereinafter mentioned, that he (Watson) could get the property at $90,000 and that if he (Scott) could get an offer above $90,000 that "we could make some money possibly out of the deal" and divide the profits three ways. At the trial, Watson's version of the conversation was that he merely told Scott that he thought the property could be bought for $90,000 and stated to Scott, "Here is something worth while if you want to go out and work on it, if you can make a deal." Shortly thereafter (on May 1st), Scott brought to Watson an offer, in the form of an earnest money contract from a Mr. Bennett, together with an earnest money check of $6000. The Bennett proposal was an offer of $105,000 of which $75,000 was to be secured by a first mortgage.

When the Bennett proposal was brought to Watson, he promptly called Kempland to his office. Kempland complained because he had previously requested Watson to obtain information for him relative to the property, and it was his view that the property should have been first submitted to him so that he could purchase directly from Richardson. Scott had not previously heard of Kempland's interest in the property. A discussion thereupon ensued between the three men, with the result (according to Watson) that the three agreed that, if the Bennett deal could be put over, the three of them would divide the profit three ways. Scott, however, testified that he and Watson agreed to take Kempland in as an equal participant and each of the parties had the privilege of submitting the property to anyone. Watson admitted at the trial that he brought Kempland into

the deal with Scott "on a profit sharing basis."

As stated, Richardson wanted all cash for the property and the Bennett proposal involved taking back a $75,000 deed of trust. This meant that it would be necessary to procure a loan in the amount of $75,000 in order to put over the Bennett deal. Each of the three men agreed that he would try to obtain a commitment for a $75,000 loan, in which event the Bennett offer would be accepted and the property would then be purchased from Richardson for $90,000 cash. Watson took the Bennett contract to the First National Bank, but the bank rejected the loan. According to the defendants, the reason for agreeing to pay Scott one-third of the profit, if the Bennett deal could be put over, was that Scott had obtained the Bennett offer and, therefore, would be entitled to compensation. No risk was involved, because the property would be purchased only if the $75,000 mortgage could be obtained.

Each of the three men made an effort to obtain the $75,000 loan from different sources, but none of them was successful in this attempt. The Bennett offer was required to be accepted within six days. The document itself, however, was not offered in evidence and Bennett did not testify. When the $75,000 loan proved to be unobtainable, Watson gave the contract and the check back to Scott for return to Bennett. There is a conflict in the evidence as to when it was returned to Bennett.

Subsequently, on May 8, 1947, Richardson telephoned Watson that he had a "hot deal" on with a Mr. Dubinsky, and said that if Watson wanted to do anything with the property he had better get busy. Both Kempland and Scott were in Watson's office at the time. It was defendants' version of this incident that Watson turned to Kempland and said, "George, let's you and I buy this property" and Kempland said "all right." According to defendants, Scott's name was not mentioned and Scott had said nothing when Watson and Kempland agreed to buy the property

for themselves. Watson then drew up a contract in the name of E. Van Pelt and obtained her signature. She was Kempland's stenographer and, in this case, a straw party having no personal interest whatever in the transaction. According to Watson and Kempland, she only represented them. Watson and Kempland took this proposed contract and Watson's check for $2500 earnest money and both went to Richardson's office on the same date, May 8, 1947, where they submitted the proposition to him. About four o'clock in the afternoon of that date the contract was signed by Richardson for himself and for McRoberts. The following morning Kempland gave Watson a check for $1250 to reimburse him for one-half of the earnest money advanced. Richardson testified that Kempland and Watson told him that they were purchasing the property.

Scott's version of what occurred was that while he was attempting to obtain the $75,000 loan, information reached him that some other broker was ready to pay Richardson $110,000 for the property, and that he so reported to Watson and Kempland. Scott testified that when he told them about this other prospective purchaser, "it was agreed" then and there "as a matter of protection" to themselves to purchase the property for the three of them; and it was also agreed that Watson would put up $2500 as "option money, or bonus money or whatever it was, in order to obtain the property." Scott said: "We authorized Watson to purchase, I did not see the contract, he was acting for us three and that was his part of the transaction." Scott further testified that the three of them, Watson, Kempland and Scott, purchased the property for $90,000. Scott put up no part of the money and was not asked to do so, claiming that that was Watson's part of the transaction. Scott testified that Watson asked him not to go to Richardson's office when the purchase was made and assured him that "his interest would be protected in every way, shape and form, and that it was not necessary." According to Scott, the Bennett contract and check were not returned to Bennett until after the con-

tract of purchase from Richardson and Mc-Roberts had been signed, nor until after a subsequent offer of Bumiller to buy the property had been submitted to and accepted by defendants and Scott.

As stated, the purchase contract between the straw party and Richardson was executed on May 8, 1947. About noon the following day, May 9th, Watson left town for a weekend visit in Illinois. Before he left he talked to a broker, R. Vernon Clark, about the property and Clark asked him to give him until noon, Monday, to make a possible deal for the property and Watson agreed. In the meantime, Scott had been working for a week or ten days with John B. Corn, another real estate broker who had desk space in Watson's office, Corn knew the property had been for sale for $175,000, but in May, 1947 (according to Corn) Scott represented himself as the owner of the property and offered it to Corn for $125,000. Corn offered the property to Ed Windsor, another broker, and Windsor offered it to Haase of the Haase Realty Company. In a prior trial Corn testified that he represented Scott as owner in offering the property to Windsor, but in this trial he said he represented the sellers, Watson and Kempland, but admitted that Scott had represented himself as an owner. William Haase of the Haase Realty Company interested Earl Bumiller in the property and gave him a price of $125,000, a figure which Scott had mentioned to Corn as being the price at which he could "deliver" the property.

On Saturday, May 10, 1947, an appointment was made at Haase's office with Bumiller, Corn was told that a possible deal was pending and with Windsor and Haase met Bumiller. Corn said that Scott knew of the proposed conference at the Haase Realty Company, but did not accompany Corn. Corn, Windsor and Haase obtained from Bumiller an offer of $120,000 cash for the property. Haase drew up an earnest money contract for that figure and gave it to Corn, together with a check for $6000 earnest money, to be submitted to the owner and Corn promptly phoned Scott and brought the Bumiller offer and a check for $6000 earnest money to Scott, who was waiting at Watson's office. Watson was out of town when Corn brought the contract and check to Scott. Scott told Corn that Kempland was one of the owners. Scott called Kempland and let Corn talk directly to him. Kempland told Corn that no action could be taken until Monday noon, May 12th, when Watson would return and get a report from Clark on the oral option extended to him.

Corn testified that he brought the contract and earnest money to Scott because Scott had told him he was an owner and could deliver the property for $120,000. On this representation Corn had worked on the deal to get it over. Neither Bumiller's name nor the price Bumiller was willing to pay had been mentioned to Corn prior to the morning of May 10th, but, when Corn reported the offer to Scott and said that Bumiller would not pay more than $120,000, Scott had told Corn the price was satisfactory to him and for Corn to prepare the contract and collect the earnest money. Scott also agreed to pay Corn and associates a five percent commission on the sale price for making the sale. The Bumiller contract, which Corn brought in, so provided, to wit, for a $6000 commission, $2000 each to Corn, Windsor and Haase Realty Company. The commission was paid out of the sale price. Scott testified that terms and conditions of the sale to Bumiller were agreed upon between Watson and himself. Until Corn reached Scott at Watson's office with the Bumiller contract to be signed on behalf of the seller, Corn had not known that Kempland was one of the owners. When Corn was advised that the Bumiller contract could not be accepted before Monday, he pocketed the contract and check and held it until Monday, May 12, 1947, at which time (after Watson had talked to Clark) the Bumiller offer was approved by E. Van Pelt, the straw party purchaser from Richardson. She signed the contract for the sellers, "as owner under contract."

Thereafter, and prior to June 8, 1947, the date fixed for closing by both the contracts, to wit, the purchase from Richard-

son and McRoberts and the sale to Bumiller, it developed that there was an easement which would adversely affect the title to the property. Bumiller refused to close the sale until the title company approved the title. Watson and Kempland then obtained an extension of time from Richardson to close the Van Pelt purchase putting up an additional $5000 to apply on the purchase price. Apparently this was paid from the $6000 put up by Bumiller as earnest money on his contract. Thereafter, a further extension of time was obtained and $10,000 additional was put up by Watson, but, about the same time an extension was granted on the Bumiller contract, Bumiller putting up an additional $10,000 deposit for that purpose, which deposit was to apply on purchase price. The result was that at closing time Watson had $250 cash invested, Kempland $1250 and Scott none.

When the title difficulty arose Watson and Kempland employed an attorney and the Lawyer's Title Company to clear the title of the easement to the satisfaction of the title company. Considerable time was required for this purpose, but the closing of both contracts was turned over to the Title Insurance Company and, ultimately, a clear title was obtained and both transactions closed. There were numerous conferences in connection with this matter, none of which were attended by Scott. Scott testified that Watson told him it was unnecessary for him (Scott) to go to the Title Company office. It was Scott's contention that having produced the purchaser, there was nothing further for him to do except to "wait patiently" for his share of the profits if the deal went through. Finally, in the latter part of June, 1947, the title was cleared and the two deals, the one a purchase and the other a sale, were closed by the Title Insurance Corporation. A detailed report and distribution sheet was made out on each transfer. The purchase price of the property was $90,000 and the sale price was $120,000. After various expenses in connection with the purchase and sale, including a $500 attorney fee, were deducted and the required adjustments made, a profit of $22,217 was realized.

This money was paid over to defendant Watson and, thereafter, Watson issued his checks to Kempland for one-half of the profits and the return of the earnest money deposit contributed by Kempland. Subsequently, Scott made demand for a third of the profits, but defendants refused to pay him anything.

As stated, plaintiff's cause of action proceeds upon the theory of a joint adventure, to wit, an agreement between plaintiff and defendants for the cooperative purchase and sale of the described real estate for the purpose of making a profit and for an equal division of the net profits between them. "A joint adventure has been aptly defined as a special combination of two or more persons, where in some specific venture a profit is jointly sought without any actual partnership or corporate designation, or as an association of persons to carry out a single business enterprise for profit, for which purpose they combine their property, money, effects, skill, and knowledge." 48 C.J.S., Joint Adventures, § 1, p. 801; Neville v. D'Oench, 327 Mo. 34, 34 S.W.2d 491, 503; Denny v. Guyton, 327 Mo. 1030, 40 S.W.2d 562, 570; State ex rel. McCrory v. Bland, 355 Mo. 706, 197 S.W.2d 669, 672, 168 A.L.R. 929; Brooks v. Brooks, 357 Mo. 343, 208 S.W.2d 279, 283, 4 A.L.R.2d 826; Stouse v. Stouse, Mo.App., 260 S.W.2d 31; Ewalt v. Hudson, Mo.App., 223 S.W.2d 132.

It is well settled that a joint adventure can only arise by contract, but the contract may be established without proof of any specific or formal agreement. The contract may be implied and inferred, in whole, or in part, from the acts and conduct of the parties and from proven facts and circumstances showing that such enterprise was in fact entered into. Denny v. Guyton, supra, 327 Mo. 1030, 40 S.W.2d 562, 571; Neville v. D'Oench, supra, 327 Mo. 34, 34 S.W.2d 491, 503. Among the observations quoted with approval from 33 C.J. 841 et seq., 48 C.J.S., Joint Adventures, § 2, by court en banc in Denny v. Guyton, supra, 327 Mo. 1030, 40 S.W.2d 562, 570, are the following: "* * *

'Whether the parties to a particular contract have thereby created, as between themselves, the relation of joint adventurers, depends upon their actual intention, which is to be determined in accordance with the ordinary rules governing the interpretation and construction of contracts.' * * * 'Any person legally competent to contract may become a party to a joint adventure.' * * * 'In the absence of statutory provisions to the contrary the contract may be oral or written. * * * The agreement is not rendered invalid by any uncertainty in the duration of the business or indefiniteness in the minor details of the adventure. * * * The mutual promises of the parties to a joint adventure are a sufficient consideration to support their contract.' * * * 'Within the scope of the enterprise they stand in a fiduciary relation each to the other, and are bound by the same standards of good conduct and square dealing as are required between partners.'"

In the Denny case the court further said: "* * * There must be some active participation in the enterprise, some control over the subject-matter thereof or property engaged therein. * * * But it may be said of the great majority of such agreements that they do not point out precisely what each party is to do under them. * * And the contract is not avoided for indefiniteness because the minor details are not fully established. * * * Decisions defining and describing partnerships are not controlling upon the question of whether the parties to the agreement were joint adventurers." 327 Mo. 1030, 40 S.W.2d 562, 570, 571. See also 48 C.J.S., Joint Adventures, §§ 2, b; 3; 5, b, p. 813 et seq.

■ The preponderance of the evidence is necessary and sufficient to prove a joint adventure. Brooks v. Brooks, supra; Stouse v. Stouse, supra; 48 C.J.S. 858, Joint Adventures, § 12; 30 Am.Jur., Joint Adventures, § 63, p. 711.

■ The cause having been tried to the court without the aid of a jury, we review the case upon both the law and the evidence as in suits of an equitable nature and give due regard to the opportunity of the trial court to judge of the credibility of the witnesses. Sec. 510.310 RSMo 1949; Cosentino v. Heffelfinger, 360 Mo. 535, 229 S.W.2d 546, 549(1); Cross v. Gimlin, Mo. Sup., 256 S.W.2d 812.

The purchase and sale in question was handled entirely in the name of a straw party who admittedly had no financial interest whatever in the transaction. A determination of the parties beneficially interested in the purchase and sale can only be arrived at from a consideration of all of the evidence. The oral testimony concerning the existence of an agreement to purchase and sell the property for the benefit of plaintiff and defendants was conflicting. The trial court, however, saw and heard the witnesses and found for the plaintiff. The court found that plaintiff and defendants purchased the said property "as and for themselves on an equal basis of one-third each"; that it was purchased for $90,000 and sold for $120,000; that the net profit of plaintiff and defendants, after the payment of commissions, attorneys and other expenses, was $22,217, which was "to be divided in three equal parts"; and that the profit was retained equally by the defendants to the total exclusion of the plaintiff. Clearly the court found an agreement as the basis for the joint adventure.

It appears from Scott's testimony and from Watson's prior deposition testimony that Watson and Scott had reached an agreement with reference to the purchase and sale of the property before the Bennett offer was obtained and before Kempland was called in "on a profit sharing basis." Defendants admit that the three parties agreed and worked together on a plan to purchase and sell for the equal benefit of all, if sale could be made to Bennett, but defendants contend that the agreement was limited to the Bennett offer alone. We think Scott's testimony that the agreement had no such limitation is strongly supported by facts and circumstances appearing from the record. Scott was a real estate broker. He offered the real estate for sale, as an owner, to Corn, Corn offered it to

Windsor and Windsor to Haase. After Haase, Corn and Windsor obtained the offer from Bumiller, Corn took it directly to Scott and "asked him if he would approve it." Scott promptly contacted Kempland, as Watson was unavailable. Kempland then told of the option to Clark. On the following Monday the offer to purchase was accepted by the straw party, "as owner under contract," and the contract was approved. The record shows that when Bumiller refused to pay $125,000 and offered $120,000 Scott directed Corn to prepare the contract and collect the earnest money; and that Scott agreed on the commission to be paid to Haase, Windsor and Corn. The contract, when signed by Bumiller, was brought directly to Scott.

It is difficult to believe that Scott, a real estate broker, would have turned the contract over to Watson and Kempland without any provision for commission or for compensation to himself, unless he was in fact a joint adventurer with them in the transaction. Nor can we believe that Watson and Kempland, under all prior facts and circumstances shown, took the Bumiller contract from Scott and had it approved by the straw party, except on some definite compensatory basis or understanding. Further, we cannot accept the testimony of Watson and Kempland concerning their alleged conversation about purchasing the property to the exclusion of Scott and in Scott's presence, but without mentioning him and without him saying anything. This is incredible in view of the prior facts, which are conceded. We think the record shows an agreement to purchase and sell for profit that was carried into execution for the equal benefit of the respective parties. Of necessity, we must defer to the finding of the trial court in so far as the credibility of the witnesses is concerned, but we think the facts and circumstances in the record further support and confirm the trial court's conclusions.

Error is assigned on the court's failure to transfer the case to an equity division for trial as requested. The ground assigned in the several motions presented to and ruled upon by the trial court was that an accounting was necessary between the parties to properly determine the profits. There was no need for an accounting. The amount sued for was easily and definitely ascertainable from the reports of the Title Insurance Corporation and the action was properly brought as one at law. Strong v. Crancer, 335 Mo. 1209, 76 S.W.2d 383, 385; 33 C.J. 841, 842, Sec. 2; 48 C.J.S., Joint Adventures, § 12(b)(1), p. 849. The ground of error now specified on appeal is that, "Since the proof showed that the purchase was made by defendants alone, whatever rights plaintiff could have, based on the alleged 'agreement,' could be adjudicated only by equity, by finding a trust, if the evidence so warranted, and determining the respective rights of the parties." No such issue was raised by the motions or presented to and ruled upon by the trial court and it may not be considered on appeal. Section 512.160 RSMo 1949, V.A.M.S.; Ebeling v. Fred J. Swaine Mfg. Co., 357 Mo. 549, 209 S.W.2d 892, 894. Further, this is not an action to establish a constructive trust in real estate, but to recover plaintiff's share of the profits from a completed transaction of purchase and sale. See Allan v. Hargadine-McKittrick Dry Goods Co., 315 Mo. 254, 286 S.W. 16, 20(5).

Appellants contend that the court erred in overruling their motion for judgment in their favor, because plaintiff failed to make a submissible case on the cause of action pleaded. Appellants say that plaintiff predicated his right to a third of the profits realized on resale upon an alleged joint purchase and ownership; that "the proof showed that the purchase was by defendants alone; and that plaintiff was not a party to such purchase." Appellant's theory is that plaintiff did not prove the allegation of his petition that *he purchased the property with defendants,* since the evidence showed only an "agreement" to so purchase the property, but that *the agreement was not complied with and the actual purchase was by the defendants alone and to the exclusion of plaintiff.* We think the evidence sufficient to sustain a finding that the intention to exclude plaintiff from any beneficial interest

in the joint adventure was not formed prior to the acceptance and approval of the Bumiller contract, nor prior to the time that Watson collected the net proceeds of the sale. Scott was excluded only in the division of the profits. The names of none of the parties appeared on the contracts as principals. As stated, the contracts of purchase and sale were handled entirely in the name of a straw party who had no beneficial interest therein. The evidence was sufficient to sustain the court's finding of an agreement for joint adventure and that plaintiff purchased the property in question along with the defendants; and that he also sold it along with them. We approve the trial court's finding in that respect.

Appellants further say that plaintiff neither pleaded nor proved a partnership or joint adventure; that he merely testified, by way of conclusion alone, that "it was agreed" the parties would purchase the property jointly; that such testimony, entirely lacking in detailed proof, did not amount to evidence of an agreement to form a partnership; that joint ownership would not show a joint adventure; and that there was no proof of an actual joint purchase. As stated, the evidence shows much more than a mere conclusion that "it was agreed" to purchase and sell. · The evidence shows acts, statements and circumstances which we think support the conclusions testified to by plaintiff and the facts found by the court.

■ Appellants insist that there was no consideration for an agreement; and that plaintiff contributed no part of the purchase price and risked nothing. The evidence shows that the agreed plan was to actively cooperate in the purchase and sale of the property and to divide the profits. The agreement of each was consideration for the like agreement of the others. Plaintiff was directly responsible for securing the purchaser to whom the property was sold at a profit. The evidence does not indicate an intention of the parties that plaintiff should actively participate other than in attempting to secure a buyer for the property. In that endeavor he was suc-

cessful. The record shows that none of the parties either intended to or did risk very much cash, or liability.

■ Appellants further say the alleged oral agreement of which no memorandum was made "was to the effect that defendant Watson would purchase the property for the joint benefit of plaintiff and defendants, with money to be provided by Watson"; that the agreement was unenforceable under the Statute of Frauds; and that, "defendants having made the purchase for themselves alone, plaintiff has no enforceable claim against them, even if the agreement had been made and breached." There is no merit in this contention. As stated, the straw party that purchased the property sold it to Bumiller. The evidence satisfactorily shows and the trial court found "that the plaintiff and defendants purchased the property * * * as and for themselves on an equal basis of one-third each." The action is for plaintiff's share of the profits. See Buckner v. Ries, 34 Mo. 357; Cordia v. Connolly, Mo.App., 261 S.W. 729, 732.

Appellants further contend that the finding in plaintiff's favor is against the overwhelming weight of the credible evidence; that "plaintiff's testimony is weak, unconvincing and lacking in corroboration, and consists mainly of conclusions"; that "defendants alone risked their money and efforts"; and that the "agreement" testified to for plaintiff was not made and plaintiff was not entitled to recover. We have carefully reviewed the evidence and have indicated our own findings. We have not overlooked the injunction set forth in Section 510.310 RSMo 1949, V.A.M.S., that "The judgment shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."

■ Appellants finally contend that the court erred in entering a joint judgment against both defendants, because the evidence "showed that the profits were neither jointly received nor jointly retained by

358

defendants." Appellants say that "defendant Watson initially received the entire profit and, thereafter, paid one-half thereof to defendant Kempland"; and that "neither defendant could be liable to plaintiff for the full amount awarded." There is no merit in this contention. The net proceeds of the joint adventure were under the control of defendants, who by agreement between themselves appropriated plaintiff's share of the net proceeds of the joint adventure to their own uses, and by agreement made an equal division thereof between themselves to the total exclusion of plaintiff. Each is therefore liable for all of plaintiff's share. 30 Am.Jur., Joint Adventures, § 65, p. 712.

The judgment is affirmed.

All concur.