**SOUTHWEST DRAYAGE COMPANY, Inc.,** Respondent,

v.

**CRAWFORD MOVING VANS, INC., a corporation, and James Crawford, Appellants.**

No. 50085.

Supreme Court of Missouri,

Division No. 2.

March 9, 1964.

Motion for Rehearing or to Transfer to Court En Banc Denied April 13, 1964.

Riddle, O'Herin & Newberry, Malden, for defendants-appellants.

Thompson, Walther & Shewmaker, Harold B. Bamburg, St. Louis, for plaintiff-respondent.

PRITCHARD, Commissioner.

In this court-tried case, plaintiff was successful in establishing that a joint adventure (based upon an alleged contract therefor) existed between the parties for moving the Federal Records Center from 1724 Locust Street to its new location at 111 West Winnebago Avenue, in St. Louis, Missouri. The decree declaring that the joint adventure did exist also ordered that an accounting be had of the profits derived by defendants in the enterprise (defendants, with another company, had bid upon a part of the moving job and completed it to the exclusion of plaintiff). From the final judgment, after the accounting was had by a referee, in the amount of $26,325.34 (including $728.62 costs) the defendants have perfected this appeal.

The evidence which is essential to a determination of this case, and which concerns the relations and dealings of the parties, is as follows: The plaintiff, Southwest Drayage Company, Inc. (hereinafter called "Southwest"), is a family corporation engaged in a local drayage business in St. Louis, Missouri. Its officers are Eugene William Ferguson, Sr., president; Mrs. Eugene William Ferguson, Sr., vice-president; and Eugene William Ferguson, Jr. (hereinafter called "Gene"), is the secretary-treasurer. Defendant Crawford Moving Vans, Inc. (hereinafter called "Crawford Company"), is also a family corporation engaged in the moving business in Malden, Missouri, and defendant, James Crawford (hereinafter called "James") is its vice-president. The two corporations in 1953 had participated in a records center moving job with a third company, the Gerald Moving Company.

In February, 1961, Gene was contacted by James in St. Louis with a proposal that the two companies bid upon various moving jobs on a partnership basis. It may have been that the General Services Administration (hereinafter called "GSA") moving job of the Federal Records Center was mentioned at that time, but in any event about March 6, 1961, Southwest received from GSA an invitation to bid on the moving job numbered GS 06 T 44. On March 14, 1961, Gene and James had a meeting concerning the job, and on the next two days they inspected the job in the company of one Henry Classe. Thereafter, up to April 10, Gene and James worked closely together in figuring the costs and the various materials and available equipment needed for the job. About March 28, 1961, there

was another meeting of Gene and James, with Mr. Ferguson, Sr., Mr. Classe and a Mr. Dumont (an insurance agent) also present. At that time the parties discussed the job further, and cast about in the group for ideas concerning it. Financing was not discussed at that time, and Gene was unaware of the problems involved in the procuring of a performance bond. On April 1, 1961, the same parties, except Mr. Dumont, were together and it was described exactly what Gene and James had figured as being the cost of the moving job, and they wanted to sit down and figure what their bid price was going to be—how much profit they thought they "could put in there and still get the bid." Each person present then wrote down on a piece of paper a price, the average of which was $196,000.

On April 3, 1961, a written joint adventure agreement was made up with the two companies as parties, but which was signed by Gene, James, Mr. Ferguson, Sr., and Albert B. Crawford (the brother of James). The writing specified that the agreement was "for the sole purpose of bidding and the movement of the GSA Federal Records Center" from and to the addresses above mentioned, on "Invitation No. GS 06 T 44"; and that the parties were to share equally in responsibilities, profits and losses, and also any expenses accumulated while preparing the bid. No bid price was mentioned in the written contract. On this same day Gene and James drove to Kansas City, Missouri, with Mr. Classe and in his automobile, for the purpose of placing the bid of the two companies for the GSA moving job. The next morning, April 4, Mr. Classe refused to sign personally the written joint adventure agreement which had been prepared for his signature. Then the bid was completed and turned in to the GSA, and before the bids were opened, Gene and James decided to increase it by $20,000 (to $226,987.13) which was done. When the bids were opened, it was discovered that the Person Moving and Storage Company was the low bidder and the instant parties were second. About a week afterwards, during which time the parties, including Mr. Classe, discussed the possibility of their still being able to get the job by reason of the Person Company being unable to procure a performance bond, GSA notified Gene that the joint adventure (Southwest and Crawford Company) was being considered for the Government Contract No. GS 06 T 44. From then on up to May 1, 1961, Gene and James each made various attempts to procure a performance bond. At that time they learned that Person Company's contract had been thrown out, and by letter dated May 2, 1961, to both Gene and James, GSA notified them that all bids on Invitation No. GS 06 T 44 had been rejected, but that the Government in the near future would advertise invitations for the moving of records and equipment and the dismantling of the shelving. Both men were alerted to the new invitations which would be issued so that they would have an opportunity to bid on either or both of the jobs as divided.

On May 4, 1961, Gene and James had a meeting with Timothy Person at which a discussion was had concerning a joint adventure among the three of them, but financial arrangements were then not discussed. These three had another meeting about a week and a half later at which the mechanics of handling the moving job and a partnership agreement among the three were discussed. A third meeting of the three, at which the partnership agreement was supposed to be drawn up and presented, was never had. At some time in this interim GSA again sought bids covering the same moving job which was then divided into two parts: Invitations for Bids No. GS 06 T 52 (for moving of records) and No. GS 06 T 53 (for dismantling and crating of shelves). Both invitations had closing dates of May 24, 1961.

Gene and James had another conference on May 15 during which James asked Gene what he thought should be the bid price,

and Gene told him, "I think we should get the bond first and then discuss the price." It was decided that Gene would be the person to procure the bond for their new joint adventure on the new invitation. Gene was going to go out with the financial statements of both the parties and try to get the bond. On the following day Gene contacted Mr. Henry Classe concerning a bond, and Mr. Classe on May 18, 1961, obtained a commitment letter for such bond from a Mr. John Glennon, which ran to Southwest and Mr. Classe and did not include Crawford Company because (as Gene testified) that company's financial statement was not in good form and there was not sufficient time to verify it.

Apparently, all during this time both Gene and James were trying to procure a bond. On May 19, James telephoned Gene and told him he had obtained a bond from Continental Casualty Company conditioned upon having $25,000 in cash; James said he had $10,000 and if Gene had $15,000 that they were in good shape; and Gene told James he had made arrangements whereby he would have $25,000 or $26,000 cash. Later, on May 21 (Sunday), James telephoned Gene and asked him to change an appointment date with a Mrs. George at the Continental Casualty Company from Monday morning to Monday afternoon, which Gene did, and James said he would call him on Monday. No call was received from James by Gene on Monday, so about 9:15 o'clock that night he reached James by telephone at the bus station after the last bus had arrived from Malden, Missouri. At this time, James told Gene he was going to stay at a hotel that night and go to the Continental Casualty Company the next morning and get the bond, and he did call Gene the next morning, May 23, and told him he was on his way to the Continental Casualty Company to pick up the bond, and that he would call him later. Meanwhile, Gene was out getting money from friends, relatives and banks. At 2:-

30 p. m., not having heard from James, Gene called the Continental Casualty Company to see if he was still there and he learned that James had left at 11:30 a. m. with the bond. At 4:00 and 4:30 p. m., James called Gene, but did not talk to him inasmuch as Gene was out getting his share of the money. James called again at 5:10 p. m., and talked with Gene at which time Gene told him he had the money; James told Gene he had the bond and everything was set to go. At the close of that conversation, James told Gene he would call back in thirty minutes, but that call was never made. At about 7:00 or 7:30 p. m., an emergency meeting was called at Southwest's office at which both Fergusons, Henry Classe and his brother, Ferd Classe, were present. Some discussion was had as to what happened to James Crawford. Upon calling the post office it was learned that in order for a letter containing a bid to reach Kansas City, Missouri, in time for bid openings the following day (May 24, 1961, at 1:00 p. m.) it would have to be deposited in the mail by 9:00 p. m.

At 8:00 p. m. on May 23, Southwest, Henry Classe and Ferd Classe entered into a written joint adventure agreement, changing the typewritten names of the contract form which had been prepared for Southwest and Crawford Company and adding the percentage by which the new parties would share in the venture, Southwest 50%, Henry Classe 25% and Ferd Classe 25%. These parties then made a bid on both Government Contracts (No. GS 06 T 52 for $145,000 and No. GS 06 T 53 for $112,000). Gene Ferguson, Jr., and Ferd Classe attended the bid openings in Kansas City and there learned that their bid of $145,000 on Contract No. GS 06 T 52 was not low, but that a bid thereon was submitted on behalf of a joint adventure composed of Crawford Company and Von Der Ahe Lines, Inc., for $142,000 which was the low bid and which was accepted. The two corporations thereafter procured

their performance bond, and these low bidders did perform the specified moving job and were paid by the Government.

We reach immediately the decisive issue in this case. That is whether there was a valid contract between the parties upon which a joint venture could be based which in turn would give rise to a right to an accounting of profits as prayed and as granted by the trial court.

■ There can be no doubt under the evidence of this case that there existed a valid contract between the two corporate parties upon the first invitation to bid upon Contract No. GS 06 T 44 which was conditional only upon the GSA accepting the bid of the parties. The parties treated it as a binding agreement for a joint enterprise; they had agreed upon a bid price and had submitted it, which act supplied that missing item from their written instrument; and they continued in their attempts to procure a performance bond on the first contract No. GS 06 T 44 up to the time that GSA notified them that all bids thereon had been rejected, and that GSA would issue new bid invitations upon a divided job. We are of the opinion that at the time GSA rejected all bids upon Contract No. GS 06 T 44, the contract of the parties relating thereto came to an end. There was then no subject matter upon which their previous agreement could have rested.

■ A joint adventure can arise only by a valid contract between the parties thereto. Denny v. Guyton, 327 Mo. 1030, 40 S.W.2d 562, 571 [7–13]; Scott v. Kempland, Mo., 264 S.W.2d 349, 354 [2–8]; Fish v. Fish, Mo.App., 307 S.W.2d 46, 50 [4]. The creation of the joint adventure by the contract depends upon the actual intention of the parties which may be determined by application of the ordinary rules of construction. The contract may be implied or inferred, in whole or in part, from the acts and conduct of the parties and from proven'

facts and circumstances showing such enterprise was in fact entered into. The agreement is not rendered invalid by any uncertainty in the duration of the business or indefiniteness in the *minor* details of the adventure. Scott v. Kempland, supra, and cases cited therein. See Annotations, 48 A.L.R. 1055; 63 A.L.R. 909; and 138 A.L.R. 968.

■ In this case we conclude that no enforceable contract was made. No agreement was reached with respect to the subject matter of the job. The parties failed to agree (1) whether they would bid upon one or both of the divided parts of the two invitations to bid (i. e., upon Contract No. GS 06 T 52 which was for the moving of the records, or upon Contract No. GS 06 T 53 which was for dismantling and crating of shelves), and (2) what would be the *amount* of their bid upon either or both invitations. Although it is true under the above-cited cases and authority that indefiniteness and uncertainty in the minor details of the adventure will not render it invalid, obviously the aforementioned two items upon which the parties failed to agree would not fall within that category. The kind of job they were going to perform and the amount of the bid they were going to make therefor are essential to the parties as a basis for figuring their anticipated profits. They would have to have a meeting of minds concerning the selection of either one or both of the jobs and whatever alternative was agreed upon, the price therefor. Dobbins v. City Bond & Mortgage Co., 343 Mo. 1001, 124 S.W.2d 1111. The evidence is clear and undisputed that the matter of the bid price was intended to be left open until the performance bond was procured. Both parties understood and agreed upon that. The record is silent as to the part or parts of the job upon which the parties contemplated they would bid.

At 12 Am.Jur. Contracts, § 23, p. 519, it is said, "A contract is not made so long as, in the contemplation of both parties

thereto, something remains to be done to establish contract relations. The law does not make a contract when the parties intend none, nor does it regard an arrangement as completed which the parties thereto regard as incomplete." See also Brown v. Childers, Mo.App., 254 S.W.2d 275, 280 [3–5]; 17 C.J.S. Contracts § 31, p. 635. At most here, there is a mutual assent that the matter of the bid price (and the undiscussed matter of what portion or portions of the job were to be selected for bidding purposes) would be deferred until the performance bond was secured. "Unless an agreement to make a future contract is definite and certain upon all the subjects to be embraced, however, it is nugatory. * * * [W]here a preliminary contract leaves certain terms to be agreed upon for the purpose of a final contract, there can be no implication of what the parties will agree upon." 12 Am.Jur. Contracts, § 24, p. 521. Under this record, which does not show that an enforceable contract was made (because the contract was not complete in all essential terms), each party had the legal right to go ahead with their individual bids to the exclusion of the other. This is in fact exactly what they did.

Inasmuch as the judgment of the trial court must be reversed because no valid contract for a joint adventure was made, we do not reach the further questions raised of the agency of James Crawford for his corporation, or the effect in law of plaintiff's conduct in going ahead and making bids upon the moving job to the exclusion of defendants.

The judgment is reversed.

BARRETT and STOCKARD, CC., concur.

PER CURIAM:

The foregoing opinion by PRITCHARD, C., is adopted as the opinion of the Court.

All of the Judges concur.