Joseph R. WILLIAMS et al. (Plaintiffs),
Appellants,

v.

John ELLIS and Phyllis Ellis, his Wife
(Defendants), Respondents,

Ocellous Ellis and Willie B. Ellis, His Wife
(Defendants), Appellants.

No. 46794.

Supreme Court of Missouri,

Division No. 2.

April 13, 1959.

Alphonse J. Lynch and W. D. Shavers, St. Louis, for plaintiffs-appellants.

David E. Horn, St. Louis, for defendants-appellants.

S. M. Thomas, Frederick E. Busse, Thomas & Busse, St. Louis, for defendants-respondents.

BARRETT, Commissioner.

Since 1949 the legal title to the piece of property known as 4267–71 Easton Avenue has been in John and Phyllis Ellis. This suit originated when the heirs at law of Reaf Williams, thirty-five or more brothers, sisters, nephews and nieces, instituted the action against two nephews and their wives, John and Phyllis Ellis and Ocellous and Willie B. Ellis. The object of the suit was to divest the title of John and Phyllis on the theory that their title was that of trustees of a dry trust; specifically the theory of the action was that John's uncle, Reaf Williams, paid a part of the purchase price and for convenience caused the title to be vested in John and Phyllis with the consequence that there was a resulting trust in Reaf's heirs at law. (A companion case involving Reaf's former wife and her claim of a resulting trust in another piece of property is Ellis v. Williams, Mo., 312 S.W.2d 97.) By cross bill the defendants Ocellous and Willie B. Ellis likewise claimed that there was a resulting trust and that the beneficial interest in the property was in Reaf's heirs at law, John's interest as a nephew being a one-thirtieth. John and Phyllis claimed the fee-simple title to the property as a gift from John's Uncle Reaf. The trial court, in its findings of fact, conclusions of law and decree found all the issues in favor of John and Phyllis and decreed title to the property in them.

The numerous plaintiffs duly filed a notice of appeal but have not taken any of the required or further steps to perfect it and as of course that appeal is dismissed. V.A.M.S. § 512.050; Sup.Ct. Rules 1.15, 1.30, 42 V.A.M.S.; 2 Carr, Missouri Civil Procedure, Sec. 1211, p. 261; Anderson v. Kuhs, Mo.App., 213 S.W.2d 238. Ocellous and Willie B. Ellis have perfected their appeal from the judgment in favor of John and Phyllis and our only concern here is with the controversy as they have presented it.

As stated, the trial court found all the issues in favor of John and Phyllis; specifically and in substance the court found that the evidence adduced by the plaintiffs and Ocellous and his wife was "not sufficiently clear and convincing to establish a trust of any kind, resulting or otherwise, * * * or to establish any interest of any nature in said real estate," and that they "have failed to prove" the allegations of their amended petitions and cross bills claiming that Reaf took title to the property in John and Phyllis for convenience or for the purpose of making a testamentary disposition of his property. The court found that in making a partial payment of $3,500 on the purchase price of the property at a foreclosure sale on February 24, 1949, and causing the property to be conveyed to John and Phyllis, Reaf "intended to and did make said payment as a gift thereof to the said John Ellis and Phyllis Ellis, his wife." In addition, the court found that John and Phyllis subsequently "took part" in the purchase of the real estate when they signed "for payment of the balance of $6,729.68 due on the first deed of trust" held by a building and loan company. As a result of its findings of fact and conclusions of law the trial court found and decreed John and Phyllis to be the fee-simple owners of the property, entitled to all rents and profits, and that the plaintiffs, cross claimants and a nonappealing intervenor had no interest whatever in the property or its income.

The appellants, Ocellous and Willie B. Ellis, contend that the part payment of the purchase price of the property by Reaf and his taking the title to the property in John and Phyllis "caused a resulting trust in favor of Reaf Williams to be presumed."

In this connection it is said that the court erred "in ignoring such presumption" which rests on the principle that "absent evidence to the contrary, it is not the intent of any such payor to make a gift to the grantee." Also in this connection it is urged, in view of the admitted fact of Reaf's making the $3,500 partial payment of the purchase price, that the burden was upon John and Phyllis to prove every essential fact necessary to the validity of a gift and that the trial court erroneously "reversed the proper burden of proof." It is urged that the trial court erred in its findings of fact in other respects, as that the respondents took part in the purchase and agreed to pay the balance due on the first deed of trust, and, finally it is asserted that the evidence did not "clearly, cogently and convincingly beyond a reasonable doubt establish a gift of the property," instead, it is said, the proof negated a gift.

■ It is obvious from the assignments of error that there is virtually no controversy as to the applicable rules and they are briefly noted now only for the purpose of distinguishing and emphasizing, largely by italicizing quotations from the Restatement of Trusts, certain factors concerning which there may be some misapprehension upon this appeal. This is the general rule: "Where a transfer of property is made to one person and the purchase price is paid by another, a resulting trust arises in favor of the person by whom the purchase price is paid, except as stated in §§ 441, 442, and 444." 2 Restatement, Trusts, Sec. 440. The first exception noted is that "A resulting trust does not arise where a transfer of property is made to one person and the purchase price is paid by another, if the person by whom the purchase price is paid *manifests an intention that no resulting trust should arise.*" 2 Restatement, Trusts, Sec. 441. As a constituent part of the latter rule with respect to manifest intention, if there is a gift of the property there is no resulting trust: "Where a transfer of property is made to one person and

the purchase price is advanced by another *as a gift* to the transferee, no resulting trust arises." 2 Restatement, Trusts, Sec. 447. The rule specifically relied upon by the appellants is this: "Where a transfer of property is made to one person and a part of the purchase price is paid by another, a resulting trust arises in favor of the person by whom such payment is made in such proportion as the part paid by him bears to the total purchase price, *unless he manifests an intention that no resulting trust should arise or that a resulting trust to that extent should not arise.*" 2 Restatement, Trusts, Sec. 454. One comment on this section is this: "If the person making the part payment manifested an intention to make a gift to the transferee, no resulting trust arises and the transferee holds the property free of trust, as he does where the whole of the purchase price is paid by way of gift to the transferee." 2 Restatement, Trusts, p. 1375. These quotations but state the general rules as they are recognized in this jurisdiction.

■ In their argument the appellants fail to recognize the importance and force of "intention" with respect to the transfer. Ellis v. Williams, supra. There is no controversy as to the burden of proof; those who claim a resulting trust have the burden of establishing it and those who claim a gift have the burden of establishing all the essential elements and factors of a gift (2 Restatement, Trusts, Sec. 458; Ferguson v. Stokes, Mo., 269 S.W.2d 655; Jankowski v. Delfert, 356 Mo. 184, 201 S.W.2d 331) although it is indeed doubtful that either need be proved "beyond a reasonable doubt." 2A Bogert, Trusts, Sec. 464, p. 529. It is also doubtful that "presumptions" play any material part in the determination of this case but if they do "we can approve only with qualifications, or explanation, the second part of the thesis, that in the circumstances stated a resulting trust is *presumed.* It is true that when one person furnishes the purchase price of land and another takes the title, the law *implies* a resulting trust in favor of the former.

As the term signifies, the trust *results* from those facts; and in that sense it may be said the law presumes or supposes an intent to create a trust after the basic facts are proven. * * * But until then no such presumption arises." Adams v. Adams, 348 Mo. 1041, 1047–1048, 156 S.W. 2d 610, 614. See also 2A Bogert, Trusts, Sec. 454, p. 419.

 In February 1949, the title to 4269–71 Easton Avenue was in Edward S. Ross, single, subject to two deeds of trust, a first and a second executed by Ross and his mother. By the first day of February 1949, the second deed of trust was in default and, after publication of notice, the trustee, Mushlin, on February 24, 1949, foreclosed the deed of trust. The property was bid in by or for Reaf Williams upon a bid of $3,500 which Reaf paid. The grantees in the trustee's deed were Reaf's nephew and niece, John and Phyllis Ellis. Either by Reaf or at his instigation the trustee's deed was recorded on March 8, 1949. This conveyance, of course, was subject to a second deed of trust, securing an indebtedness of $8,500, held by the Washington Federal Savings & Loan Association.

In addition to these admitted facts the plaintiffs' evidence concerning the tranfer and to establish a resulting trust was this: While the second deed of trust was regularly foreclosed a real estate agent, representing "his company" (the owner of the note and second deed of trust), handled the details of the foreclosure and sale to Reaf and in so doing he had no dealings with John and Phyllis. At the time of the foreclosure the balance due the building and loan company on its first deed of trust was $6,729.68 and on March 29, 1949, after conversations with Reaf, these documents were all transferred to John and Phyllis Ellis. The original "loan account book" was transferred from Ross to John and Phyllis and subsequently a new book was issued to them. At the same time John and Phyllis signed or executed an application for membership in and a loan from the building and loan company. Reaf's name did not appear in any of these documents. The secretary-treasurer of the building and loan company said that on one occasion Reaf on behalf of "his clients" objected to the premiums being charged for fire insurance. This witness also identified tax receipts issued to John and Phyllis. Another witness, representing the New Age Savings and Loan Association, testified that his company was a tenant in the building; the company's lease, first for a year and then for five years, was negotiated with Reaf and the rent was paid to Reaf. However, Reaf's nephew, John, was to and did take care of the furnace and the leases were signed by "John Ellis." A coal dealer, in supplying coal for the building, dealt with and was paid by Reaf. Another witness, a real estate agent and Reaf's friend and adviser, said that Reaf made and paid for certain repairs on the building. Reaf's brother, Joseph, who with Ocellous was coadministrator of Reaf's estate (Reaf died May 23, 1953), enumerated the names and relationship of Reaf's numerous heirs at law. It is not necessary to pause and comment on this testimony, to indicate the possible inferences and its probative effect; it is sufficient to note that this was the substance of all the evidence adduced by the plaintiffs in support of their claim of a resulting trust.

At this point the defendants and cross complainants, Ocellous and Willie B. Ellis, assumed the burden of proving their cross claim and a resulting trust. Their only evidence consisted of Ocellous' testimony and parts of the depositions of John and Phyllis which were read as admissions against interest. Ocellous says that from Thanksgiving 1952 until Reaf's death on May 23, 1953, that he worked for his Uncle Reaf, collected rents, paid bills and cared for the furnace. Despite the fact that the trustee's deed in which John and Phyllis were the grantees had been recorded the parties seem to have attached considerable significance to its possession. Ocellous says that he saw the deed of trust in Reaf's

desk at 4267–71 Easton where he had an office. On one occasion, when Reaf was in the hospital, he gave Ocellous the deed of trust and Ocellous had it in his possession for a month or six weeks and when Reaf left the hospital he again took possession of the deed of trust. The next time Ocellous saw the deed of trust was after Reaf's death when he found it in a suitcase in Reaf's closet. He took possession of it and collected the rents on the building from then until July 24, 1953. He used the rent to pay utility bills and the payments to the building and loan company, the expenditures consuming the rents. On July 24, 1953, Ocellous gave John the deed of trust and from thenceforward John has collected the rents and disbursed the proceeds, chiefly in paying the building and loan company and that indebtedness has now been paid. Ocellous says that after Reaf's death he had several conversations with John concerning this property and its title. In one, about a month after Reaf's death, Ocellous said, "Yeah. And I said to John, I said, 'If Uncle Reaf bought this property for you,' I said, 'Why is it that he didn't give you the deed, that he gave it to me?' So John said, 'I know Uncle Reaf didn't buy this property for me,' he said, 'but the title to it is in my name, and I'm going to get it.'" On another occasion they met in a lawyer's office, Ocellous' lawyer, and he said, "John wanted me to give him the title. He said because the title was in his name, that he should have it, but I didn't think so. I thought that if my uncle had wanted him to have it, he would have given it to him, and that my giving it to him wouldn't make it his anyway." Ocellous says, "My uncle told me that he had them (John and Phyllis) sign a deed" (meaning the loan papers in connection with the first deed of trust). Ocellous said that his Uncle Reaf was sick for a long time before he died and he conceded that John took him to the hospital "or things like that" on several occasions, that Reaf furnished John a car for his personal use, that Reaf often ate his meals and visited in John's home and that his uncle liked John and his wife and their children, "He always tried to help them." He also concedes that Reaf often gave John money for his children and paid bills for them. Ocellous filed one suit against John over this property and then dismissed it. He says that he gave the trustee's deed to John so that his lawyer could examine it and John just kept it. He conceded that Reaf caused the income from this property to be accounted for in John's income tax returns.

From John's deposition Ocellous' counsel read these typical excerpts as admissions: " 'No, I didn't exactly buy it myself, but it was bought for me.' * * * 'For me and my wife.' * * * 'Well, my uncle, Reaf Williams, was taking care of that for me.' * * * Question at the bottom of page 6: 'Are you saying that your uncle, Reaf Williams, purchased this property for you and your wife?' Answer: 'That's right.' * * * Well, he said, 'I am going to take charge of it as long as I live and I am going to fix it so that when I pass, you will have something and you can go on from where I leave off.' " In his deposition John conceded that he did not collect the rent while Reaf was alive and that he did not pay the taxes or for any repairs.

From Phyllis' deposition Ocellous' counsel read these excerpts: " 'He discussed the property when he spoke about a loan. * * * I don't remember just when it was but a short time after that he was talking about making a loan on the property and he wanted us to sign for the loan' " (referring, presumably, to the first deed of trust and the indebtedness to the building and loan company). * * * 'Well, he said that he was going to make a loan and he wanted to know if we'd sign for the loan which he wanted to make to buy the place; he was going to make a loan to buy the property and he wanted to know if we'd sign it. * * When he came out of the hospital; he said that he had left everything settled so that, if anything happened to him, all of the bills were taken care of and that my hus-

band and I would not have a bit of trouble.' * * * Question: 'That, in the event of his death, the property would be yours and your husband's?' Answer: 'That's right.' * * * Question: 'Was that stated to you and John by Mr. Reaf Williams?' Answer: 'Yes. * * * On several occasions.' " And this was all the evidence adduced by the plaintiffs and the defendants Ocellous and Willie B. Ellis and those claiming a resulting trust and again it is not necessary to analyze the evidence and call attention to the possible permissible inferences.

On behalf of John and Phyllis another tenant in the building, Davenport, testified that he leased the first floor for a pool hall. He negotiated the lease with Reaf but, "He gave me the price of the rent, and he told me I would have to come back the next day, because he would have to see his nephew and see if it was permissible to him for me to have a recreation parlor in the building." Davenport came back the following day and Reaf had a lease prepared, signed and executed by John. Subsequently Davenport desired to be released from the lease and Reaf said he would have to see his nephew and would mail a statement "when he found out from his nephew what to do." In the letter Reaf said, "I have taken up your proposition with the owner Mr. John Ellis. We are prepared to except (sic) the proposition which we discussed," and Davenport paid $480 in rent and for a discharge from the lease. This letter was signed, "Reaf F. Williams, agent." In March 1950, for one year, and in 1951, for five years, the New Age Savings & Loan Association leased the first floor of the building, the leases being signed by "John Ellis, lessor." The lawyer, consulted by Ocellous and John was also Reaf's lawyer, said that Reaf told him of the affection he had for John and his children and of his gratitude for what John had done for him. It is he who at Reaf's request made out the income tax returns and in John's returns accounted for the rent on this property. He was not paid for making

the returns and when asked on cross-examination whether Reaf accounted for the rent in John's return "to defeat" the government said, "I have no knowledge on that subject. * * * I had no such intent."

Emily C. Menke was the manager of the Pierre Chouteau Apartments and John's employer. She said that on one occasion Reaf called and wanted to come by and get John because of furnace trouble at the Easton Avenue property and in the course of that conversation Reaf said, " 'You know, I bought that building, gave it to him, John, and his wife.' " Reaf spoke "very highly" of John, said that he had eaten most of his meals with him and that they were very kind to him. Sometimes, when she called John's home, Reaf was there babysitting, and on occasion John left his place of employment to take Reaf to the hospital. On another occasion she said, "He (Reaf) told me, he had told me at one of the first meetings that he had bought a building for John Ellis and his wife." On cross-examination she repeated that Reaf had told her "that he had bought a building for John Ellis and his wife."

John's counsel then read from John's deposition certain testimony, some of it explanatory, omitted by Ocellous' counsel. "Question: 'Now, when you say it was bought for you, do you mean that it was bought for you, and not for you and your wife?' Answer: 'For me and my wife.' * * * Question: 'Who bought it for you and your wife?' Answer: 'Well, my uncle, Reaf Williams, was taking care of that for me.' * * * 'By virtue of what do you claim to own the property?' * * Answer: 'By a deed.' * * * Question: Did you and Mrs. Ellis buy the property?' Answer: 'Well, we signed for a loan, but I couldn't tell you how much of it was paid on the property, if any. * * * He told me he was going to buy it for my wife and I.' " In testifying in his own behalf John denied making the statements attributed to him by Ocellous, that he knew that his

**244**

uncle had not given him the property but he intended to get it anyway.

Some of the appellants' evidence, as well as the plaintiffs', may be subject to the interpretation that it supports the inference of testamentary intention and even of a resulting trust. But by reason of Reaf's obvious affection for John and his family, reciprocated by conduct, Reaf had some sound reason or motive for giving the part payment and this piece of property to John and his wife. Hunnell v. Zinn, Mo., 184 S.W. 1154. As stated, it is not necessary to analyze and demonstrate, the essential question was Reaf's intention when he paid part of the purchase price and caused the trustee to convey the property to John and Phyllis. The appropriate inferences to be drawn depend upon the credibility of the oral evidence, some of it conflicting, and it is sufficient to say that there was evidence in support of the court's finding of a gift to John and Phyllis and by the same token the evidence supported the court's finding that there was no resulting trust and there is no demonstrable reason upon this particular record for this court's not deferring to the trial court's supported findings. Warford v. Smoot, 361 Mo. 879, loc. cit. 887, 237 S.W.2d 184, loc. cit. 188; Suhre v. Busch, 343 Mo. 679, 701–702, 123 S.W.2d 8, 19–20; Price v. Rausche, Mo., 186 S.W. 968.

For the reasons indicated the plaintiffs' appeal is dismissed and the judgment is affirmed.

BOHLING and STOCKARD, CC., concur.

PER CURIAM.

The foregoing opinion by BARRETT, C., is adopted as the opinion of the Court.

STORCKMAN, P. J., EAGER, J., and BROADDUS, Special Judge, concur.