**Grace Brady FULTON,
Plaintiff-Respondent,**

v.

**J. C. FULTON, Defendant-Appellant.**

**No. 9693.**

Missouri Court of Appeals,
Springfield District.

Sept. 22, 1975.

nishings and farming equipment located on the farm "as the property settlement between plaintiff and defendant." The petition alleged the farm, household goods, furnishings and farming equipment had been acquired by Grace as her separate property before the marriage and that she had purchased the livestock with her own money without contribution from J. C. The amended counterclaim filed on behalf of J. C. asked for (1) a divorce, (2) alimony in gross, (3) a decree declaring Grace in contempt for violating an injunctive order, (4) a decree fixing J. C.'s rights to the farm either via a resulting trust, joint adventure or equitable lien, (5) an accounting of J. C.'s interest in the sale of livestock and other personal property by Grace, and (6) partition of the real estate. The court nisi entered judgment for J. C. on Grace's petition and for Grace on J. C.'s counterclaim. J. C. alone perfected his appeal, contending the trial court erred in not finding for him on all items of his asseverations save his claim for alimony and partition. However, since the appeal, Grace, without apparent objection from J. C., has secured a divorce or dissolution of the marriage elsewhere, so that phase of the matter is now moot.[1]

Ages of the parties are unknown, but neither was unseasoned nor a neophyte at nuptials. Both resided in California when our concern commences. Grace became a widow in 1965 upon the demise of Barney Brady; J. C. was then married to one Laura. Within "several weeks" after Grace assumed widowhood, or more precisely in January 1966, J. C. began to pay her court. Intolerant of the association Laura sued J. C. for divorce and obtained a final decree therefor on July 21, 1967. J. C. and Grace married eight months later in March 1968 and moved onto the Oregon County, Missouri, farm in July 1968.

In July 1966 while J. C. was still wedded to but separated from Laura, he and Grace

John C. Holstein, Rich D. Moore, Moore & Brill, West Plains, for plaintiff-respondent.

Harold L. Henry, West Plains, for defendant-appellant.

Before BILLINGS, C. J., and TITUS and FLANIGAN, JJ.

TITUS, Judge.

Grace Brady Fulton (Grace) sued J. C. Fulton (J. C.) for divorce in the Circuit Court of Oregon County, Missouri, on March 9, 1973. In the amended Count II of the petition Grace asked the court to award her a 92-acre Oregon County farm, certain livestock, and all the household goods, fur-

---

1. Those interested in the jurisdiction of a court to entertain and decide the claims made by J. C., even upon denial of a divorce, are directed to *Coffey v. Coffey*, 485 S.W.2d 167 (Mo.App.1972) and the cases therein cited and considered.

journeyed from California to Missouri and Arkansas on vacation. The trip's purpose was to visit kin and neither sojourner contemplated the purchase of real estate in the vacation area or elsewhere. While picnicking with Grace's sister and brother-in-law and through sheer happenstance, the quartette espied a "For Sale" sign in the yard of the Oregon County farm in question and inquired of the owners in residence. The total price was $17,000—$1,000 was needed to hold the deal, another $4,000 was required forthwith before deed delivery, and the balance was to be evidenced by a $12,000 promissory note payable in yearly $1,000 installments plus interest. From this point forward the evidence is in disaccord.

Grace said that before seeing the farm she and J. C. had no discussions concerning their possible marriage. Contrawise, J. C. testified that a day or two before the farm was purchased, and while the two were ensconced in the romantic confines of a fishing boat, he broached the subject of marriage to Grace (to become effective when his divorce from Laura became final) and she expressed amenability to the proposition. Under Grace's version, J. C. had no part in purchasing the farm or in the negotiations relative thereto. Additionally Grace contended that J. C. did not contribute to the $1,000 holding payment because "I had the money to pay the down payment on the farm" ($500 of which was borrowed from her father), that there was no understanding the title was to be put in her and J. C.'s joint names when his divorce became final, nor any agreement that J. C. was to have any interest in the farm, either at the time of purchase or thereafter. In support of her assertions, Grace produced five checks of $100 each dated from November 1966 to May 1967 payable to her father. They were drawn on a California bank against the account of Barney H. and Grace L. Brady. Grace said these checks represented restitution of the $500 she had borrowed from her father to make one-half of

the $1,000 holding payment. Also, Grace put in evidence a $4,000 check dated July 5, 1966, drawn on the California bank against the same account, which she testified completed the $5,000 down payment on the farm. Grace additionally proffered a $1,000 written receipt from the farm sellers which did not mention J. C., the warranty deed to the farm dated July 2, 1966, naming Grace Brady as the lone grantee, and the paid $17,000 promissory note dated July 18, 1966, signed by Grace Brady as the sole maker. Grace ceded, however, that J. C. had given her a total of $3,800 (none of which was for the holding payment) "and I paid it on the farm." She had kept in an address book a penned record of J. C.'s payments to her in 1966 after they returned from their vacation trip. Under the heading, "J. C. Paid on House and Farm," Grace had recorded two $250 and one $100 payments in July 1966, and 12 payments of $50 each to November 18, 1966. She acknowledged also that J. C. gave her $1,000 "for the payment on the place in December of '67", and that in January 1969 J. C. gave her $1,500 which she put with money drawn from her account in the California bank "for the payoff of the place."[2] During 1967, according to Grace, J. C. "give [sic] me some [money], but not very much. . . . [H]e told me to use it for whatever I wanted and he ate his meals at my house, two meals a day . . . and I used the money for groceries." Grace had no record or recollection of the amount J. C. gave her in 1967 (save the $1,000 payment in December 1967), and testified that after moving to Missouri in July 1968, J. C. gave her money "from time to time [and] told me to do [with it] whatever I wanted to." Grace asserted that J. C. did not work after they moved to Missouri and that they lived off her $21 a month retirement, money she got for keeping foster children for a year and a half, and money from the sale of pigs. Grace maintained that no money given her by J. C. went into her account in the Cali-

---

2. The written record payments amount to $1,200; when added to the $1,000 and $1,500 payments, the total would be $3,700, rather than $3,800 as stated by Grace.

fornia bank and that J. C. made no deposits to that account nor to the joint account they had in the Alton (Missouri) Bank, more of which anon. It was agreed that after J. C.'s divorce from Laura became final, he asked Grace to put the farm in their joint names and she refused. Grace did not admit knowledge of the farm's value on the date of trial (November 8, 1973), but did admit that "over three years ago" she had the place listed for sale at $43,000.

Contrary to Grace's recastings, J. C. maintained he was a participant in the inspection, negotiations and purchase of the farm. He said that when the terms of the sale were ascertained, "Grace and myself [sic] decided we could get up five hundred dollars between us. And her father [said] he would loan us five hundred dollars to pay the thousand dollars . . . to hold the deal. And we would send [the other $4,000] back to him when we got back to California. [S]o the money I had and the money [Grace] had and the [borrowed $500] made the thousand dollar payment." When asked what was said about the title between J. C. and Grace while they were dealing to buy the farm, J. C. related: "I was in the process of getting a divorce in California and we discussed . . . putting the place in [Grace's] name so this ex-wife of mine . . . couldn't cause us any trouble. She agreed to it [but] after everything blowed [sic] over in California I tried to get Grace to put my name on the deed and she refused. . . . So we went back to California [and] on two different occasions I gave Grace two hundred and fifty dollars on that five hundred dollars . . . [f]or the thousand dollar down payment on the place."[3] J. C. stated that Grace had a "savings" in the California bank and that when they returned from the vacation trip, she sent $4,000 (balance of the down payment) "and the money that I

gave her she put in the bank in that savings account." In addition to the two $250 payments, the $1,000 payment made in December 1967, and the $1,500 payment made in January 1969, as testified to by both J. C. and Grace, J. C. claimed payments to Grace of $50 a week for "I think twenty-one months up until we got married or something like that and then I started giving her seventy-five dollars a week [which continued for] about nineteen weeks I think." J. C. calculated the $50 weekly payments came to $4,550 and the $75 weekly payments amounted to $1,425. Although the two $250 payments, the $1,000 and $1,500 payments, and the various weekly payments testified to by J. C. came to a total of $8,975, he testified that to the best of his knowledge he had given Grace $11,990 "on the payment of this property." When, where, and by what means the $3,015 difference was paid went unexplained at trial.

When J. C. and Grace moved to the farm in July 1968, an account was opened at the Alton (Missouri) Bank in the names of "J. C. Fulton or Grace L., Rt. # 1, Couch, Mo." The initial deposit was made with a $6,800.56 cashier's check dated July 2, 1968, which Grace said she had bought "at the bank in California." In explanation of the source of the money used to buy the check, Grace testified that "Five thousand dollars of it came *from the sale of my house* [and the balance from] three checks, three weeks' pay, two weeks' vacation and I had sold my car and . . . my husband's police gun and some furniture." Not congruous with this assertion was Grace's previous testimony that when she paid the $7,014.77 balance of the $17,000 promissory note in February 1969, she "drew fifty-five hundred dollars out of the [California] bank *from the sale of my house* and [J. C.] gave me fifteen hundred dollars and I paid the place off." (Emphasis supplied). Unless

---

**3.** If, as J. C. testified, both he and Grace contributed money to make half of the $1,000 holding payment while they were in Missouri dealing for the farm, why, upon returning to California, did he feel obliged to give Grace all of $500 towards the entire payment without then or later asking credit for the unknown sum he had already contributed or paid?

Grace was feoffee of more than one California house or received more than approximately $5,000 from the sale thereof (and the record does not indicate either was so), it exceeds logical explanation to say the proceeds "from the sale of my house" were used to purchase a cashier's check which in July 1968 was deposited in the Alton (Missouri) Bank, yet seven months later were on deposit in a California banking institution. In any event, Grace asseverated J. C. had not contributed anything to buy the cashier's check and had never made a deposit to the joint account at the Alton Bank.

J. C., while admitting that he did not tell Grace what to do with all the money he allegedly gave her, indicated that "she knew what it was for" and that she deposited it in her account in California. He agreed with counsel that the $6,800 used to start the joint account in the Alton Bank came from Grace's account in California, and while previously on deposition J. C. had said he could not estimate how much of that fund he had given Grace, he opined at trial he had contributed "at least half of it." In dispute of Grace's saying that J. C. had never made a deposit to the joint account at the Alton Bank, J. C. said that after they had been farming for some time, he culled out the old cattle from the herd, sold them and put the money in the account.

The parties agreed the cattle initially put on the farm had been bought and paid for from the joint checking account in the bank at Alton. A July 27, 1968, check in the sum of $2,220.63, signed by J. C., was given "For: Cows 15;" a $200 check dated August 5, 1968, signed by J. C., was written "For: 1 Bull"; Grace wrote a $980.50 check on September 7, 1968, "For: Cows 8." At the time the parties separated, J. C. said there were approximately 46 cows and calves on the farm. But whatever the count may have been, Grace sold cattle on September 20, 1973, for $11,800, all of which

she put in the bank in her name without giving any of the proceeds to J. C.

Hogs first put on the farm consisted of 5 sows and 1 boar. Grace claimed they were bought by her father with Grace's paycheck—not out of the joint account.[4] J. C. claimed that he bought the swine for cash from "a lot of change and stuff . . . that we had saved up in California." He said there were 12 sows, 1 boar and 16 pigs on the farm when the separation occurred. Grace admitted selling 7 sows, 1 boar and 24 pigs for $1,700, but in answering interrogatories, she responded the sale of 32 swine brought $2,719.97.

In her petition, Grace averred she was the sole owner of all household goods, furniture, etc., and all farm and garden implements including, among other things, a tiller, tractor and lawn mower, because they were bought and belonged to her before she married J. C. She partially contradicted herself by producing a $400 check drawn on the joint account at the Alton Bank dated August 13, 1968. The check was signed by J. C. and was "For: Tractor & Equ." Grace produced a witness whose testimony was intended to match the furniture and household equipment seen by her in Grace's California home with the same items the witness had observed later in the Missouri farmhouse. Unfortunately for Grace, the witness' responses to questions regarding specific items were liberally salted with such answers as "I don't remember about that. . . . I can't say for sure. . . No . . . Well, I don't know. . . . No I can't [and] I can't tell you that either." With the exception of a $250 sewing machine J. C. said was bought before he married Grace, with funds from Grace's California account to which he had contributed, it was J. C.'s testimony that all the household and farm items and equipment had been accumulated and purchased "since we were married" from moneys contributed by both. J. C. stated these items of personal property

4. As already noted, Grace also testified her paycheck or checks were used to buy the cashier's check from the California bank

that went into the account at the Alton Bank.

had a value of $5,600. Questions propounded to J. C. by Grace's counsel pointed out that J. C. was attempting to claim multiple credits for the money he had allegedly given her, i. e., J. C. was asking that the full amount of the money be counted not only as his contribution on purchase of the farm, but also be credited as a contribution by him for living expenses, counted in the moneys deposited in the California and Missouri bank accounts, and considered as an item in his favor when calculating money spent for purchase of livestock and household goods.

■ In answer to J. C.'s urgings on appeal that the trial court erred in not fixing him with some rights to the farm either through a resulting trust, joint adventure or an equitable lien, Grace counters first with the averment that the court's failure to accommodate J. C. may be justified under the "unclean hands" doctrine, or, if you prefer the "clean hands" maxim. This contention arises from J. C.'s insistence that the only reason the deed was made to Grace alone in the first place was to preserve the farm from possible claims by his then wife, Laura, should title appear in the names of both Grace and J. C. Although "equity refuses to lend its aid in any manner to one seeking its active interposition who has been guilty of unlawful or inequitable conduct in the matter with relation to which he seeks relief" (30 C.J.S. Equity § 93, at p. 1009), the clean hands doctrine has its limitations and " 'does not apply to every unconscientious act or inequitable conduct . . .' " *Price v. Ridler*, 373 S.W.2d 59, 62[2] (Mo.1963). The party seeking to invoke application of the doctrine (here it is Grace) must show that he himself was wronged and injured by the conduct of which he complains. *Hunt v. Easley*, 495 S.W.2d 703, 707 (Mo.App.1973). In this case, Grace was in no way injured by J. C.'s alleged wrongdoing. Indeed, she was, if anything, a party to it and the benefactor thereof. She cannot avail herself of the doctrine.

■ A person claiming a purchase money resulting trust has the burden of proving it. *Williams v. Ellis*, 323 S.W.2d 238, 240[3] (Mo.1959). Variously stated, the rule respecting the sufficiency of the evidence to establish such a trust is that a preponderance of the evidence is not enough, that the proof must be so clear no reasonable doubt can be entertained of its truth, and that the evidence must be so impelling, unturbid, unequivocal, cogent, unquestionable, and positive in character as to banish and exclude every reasonable doubt from the chancellor's mind. *March v. Gerstenschlager*, 436 S.W.2d 6, 8[1] (Mo. 1969).

■ As distinguished from an express trust, a resulting trust is something implied by law from conduct and acts of the parties and the circumstances and facts as they existed at and attended the transaction out of which the trust arises. It is necessary and essential that the money or other consideration furnished for the conveyance shall have been, in part at least, the property of the person who claims to be a beneficiary of a resulting trust [Bogert, Law of Trusts § 74 (4th ed. Hornbook Series), at p. 198], and there must be a presumed intent on the part of the grantee to hold for the cestui. The trust, if any, comes by implication from circumstances and facts, not from an express agreement, and an intention that there be a trust is an essential element, though the intention is not stated by words or direct creation. *O'Leary v. McCarty*, 492 S.W.2d 124, 128[2, 3] (Mo.App.1973). If property is conveyed to one and another pays part of the purchase price, a purchase money resulting trust may arise in favor of the partial payor in such proportion as the part paid bears to the total buying price (or as the intention of the parties otherwise indicates), unless the person making part payment manifests an intention that no resulting trust should arise or that a resulting trust based on the ratio between the full price and partial distribution should not arise. *Decker v. Fittge*, 365 Mo. 139, 144, 276 S.W.2d 144, 147[3] (1955); Restatement,

Second, Trusts § 454. However, the unilateral manifestation of the disclaiming cestui only serves to negative the creation of a trust and the absence of such manifestation does not, per se, serve to prove a creative intention of the parties. If the alleged trust claimed by the intended cestui is not of the whole of the property, the proportionate interest must be clearly and definitely shown [*Ellis v. Williams*, 312 S.W.2d 97, 101[7] (Mo.1958)], and should the amount of money contributed by the claimant be uncertain, no trust can result in his favor. *Bogert, supra*, at p. 200. Moreover, a resulting trust "must arise, if at all, at the instant the deed is taken. Unless the transaction is such that the moment the title passes the trust results from the transaction itself, then no trust results. It cannot be created by subsequent occurrences." *Bender v. Bender*, 281 Mo. 473, 477, 220 S.W. 929, 930[5] (1920); *Dougherty v. Duckworth*, 388 S.W.2d 870, 874[1] (Mo.1965). When property is transferred to one person, no resulting trust arises merely because another person subsequently pays or assumes an obligation to pay for the property in whole or in part. Restatement, Second, Trusts § 457.

■ J. C.'s evidence, completely contradicted by Grace, was designed to show that at the time of purchase, Grace (sole legal owner of the farm) was acting for both, and that at some future unknown date "after everything blowed [sic] over in California," she was to put J. C.'s "name on the deed" to endow him with some unstated partial or joint interest in the property by reason of some sort of a tenancy that went wholly unspecified. This is not impelling, unequivocal, cogent, unquestionable and positive evidence of an intention on the part of the parties that there was to be then and there a purchase money resulting trust in favor of J. C. Furthermore, a total dearth of proof existed as to what exact amount, if any, J. C. supposedly contributed to the $1,000 holding payment, and no attempt was made to prove that at or before the date the deed was delivered J. C. was to pay

any certain sum or percentage of the total purchase price. To the contrary, the documentary evidence and some testimony by J. C. (see note 3, supra), indicate that whatever money J. C. gave to Grace to be applied on the farm purchase was paid after the deed was taken. The different times the monies were given and the differing amounts thereof, could be viewed as more attuned to capriciousness than to a studied steady design of regular payments intended to satisfy a known fixed obligation. A resulting trust does not arise in favor of one who makes only indefinite or general contributions to the purchase price. Scott, Trusts § 454, at p. 2284. Irrespective of Grace's records, one can only guess from J. C.'s testimony as to what sums he actually gave her to pay on the farm, when his relatings as to payments are marked off, fore and aft, with "I think," and when his recitations of weekly and lump sum payments miss his claim to a total sum by some $3,000. And, as already observed, J. C. perhaps sought credit for the payments on more accounts than that relating to the farm purchase price. Under these circumstances and additional ones included in our recounting of the facts, supra, the court nisi cannot be held to have erred in failing to impose a purchase money resulting trust in J. C.'s favor on the farm, particularly if due regard is given, as it must be, to the better opportunity of the chancellor to have judged the credibility of the witnesses. Rule 73.01, subd. 3(b).

■ The second try by J. C. at investing himself with a share of the farm is predicated on the theory of joint adventure. He does not say how an interest in real estate may come about under that theory. We can only assume J. C.'s idea springs from the law that "where the title to property purchased or acquired in connection with a joint adventure or the profits thereof is in the name of one of the parties, he holds it in trust for his associates according to their proportionate shares. If he paid the purchase price with his own money, then the

question whether he is the exclusive owner of the land, or whether his associates have an interest in it, depends on the agreement between them. If the agreement merely provides that they are to share only the profits for services to be rendered, they have no interest in the land but only in the profits. Where, however, the land cannot be disposed of except under the joint direction of both parties, or without the consent of both, it has been held that the associates of him who has the title also have an interest in the land itself." *Dierks & Sons Lumber Co. v. Bruce*, 239 S.W. 133, 134–135 (Mo.1922); *Stouse v. Stouse*, 270 S.W.2d 822, 826 (Mo.1954); 46 Am.Jur.2d, Joint Ventures, § 40, pp. 59–60. Of course before J. C. could successfully claim entitlement to a decree declaring him a joint (or whatever) owner of the farm under the theory of joint venture, he first had to prove by a preponderance of the evidence [*Scott v. Kempland*, 264 S.W.2d 349, 355[9] (Mo.1954); *Brooks v. Brooks*, 357 Mo. 343, 351, 208 S.W.2d 279, 284[6] (1948)] that a joint adventure in fact existed between him and Grace. 48 C.J.S. Joint Adventures § 12 g. (3), p. 856.

■ A joint adventure exists when there is a special combination of two or more persons jointly seeking a profit in some specific venture without actual partnership or corporate designation. It has been defined also as "an association of persons to carry out a single business enterprise for profit, for which purpose they combine their property, money, effects, skill, and knowledge." *Scott v. Kempland*, supra, 264 S.W.2d at 354[1]. "Briefly stated, the principal requisites of a joint adventure are a community of interest in accomplishment of a common purpose, a joint proprietary interest in the subject matter, a mutual right of control, a right to share in any profits, and a duty to share in any losses." *Fish v. Fish*, 307 S.W.2d 46, 49[2] (Mo.App.1957). The sine qua non of the relationship is a contract or agreement between the parties which, if not expressed, may be inferred or implied, in whole or in part, from the conduct of the parties and circumstances indicating the existence of a joint adventure. The contract or agreement is not invalid because of indefiniteness in the minor details of the adventure nor by reason of any uncertainty in the duration of the business. *Southwest Drayage Co. v. Crawford Moving Vans, Inc.*, 377 S.W.2d 293, 297[2–5] (Mo.1964).

■ When directed to the issue of the existence vel non of a joint venture between Grace and J. C. concerning the farm, the evidence in the instant case is highly ambiguous to say the least. J. C. stresses an isolated part of his testimony relating to a statement allegedly made to him by Grace's father while an effort was being made to accumulate the $1,000 needed for the holding payment, to wit: "So her dad called me over to one side and told us that if you kids want the farm, this is the one to buy if you want to move back here. He also told us it was a good business investment if we never did want to move back here. He said it was a bargain  . . .." Grace counters with the argument that this uncorroborated testimony does not suggest an agreement on her part (expressed or implied) to engage in a joint adventure and, if true, was at best merely a recitation of an unsolicited observation by her father. It can also be said that the statement attributed to Grace's father equivocated between two possibilities, i. e., if they did or did not "move back here," and could not form a solid basis to support an inference or implication of a mutual agreement that the purpose for buying the farm was to enter into a particular business venture for profit rather than to acquire a bucolic home after the couple's conjugate relationship became legalized at some future time. J. C.'s disputed claim that, shortly before the farm was bought, he and Grace had agreed to their own nuptials after his divorce from Laura was final, could indicate that what they had in mind was not the purchase of land for a joint venture for profit; and the additional fact the property was actually

used as a home subsequent to the marriage would tend to weaken any inference that the purchase was made for business purposes. In short, without endeavoring to detail the sparse evidence on the subject and without violating the chancellor's theoretically superior assessment of the credibility of the witnesses, we cannot contradict the trial court's apparent finding that a joint venture between the parties was nonexistent.

The theory of equitable lien has its ultimate foundations in agreements, express or implied, that some specific property (Pomeroy's Equity Jurisprudence, 4th ed., § 1234, at p. 2961) is to be pledged as security for a debt or obligation. *Wilkinson v. Tarwater*, 393 S.W.2d 538, 542[5] (Mo. 1965). An equitable lien is not an estate in the property itself; neither is it a right on which a possessory action may be based. It is simply a charge upon the property for the purpose of security. *Jamison Coal & Coke Co. v. Goltra*, 143 F.2d 889, 893[5, 6], 154 A.L.R. 1191 (8th Cir. 1944), cert. den., 323 U.S. 769, 65 S.Ct. 122, 89 L.Ed. 615. Standing alone, the failure to repay money as agreed is not sufficient reason to decree an equitable lien [*Hahn v. Hahn*, 297 S.W.2d 559, 565[5] (Mo. banc 1957)]; "nor does the mere fact that one person advances money to another which enables the latter to purchase property give the former an equitable lien for his advances on the property when purchased." 53 C.J.S. Liens § 4 c. (3), pp. 846–847; *Bridgford v. Buttercase*, 450 S.W.2d 454, 457 (Mo.App.1970).

In this case there is no suggestion of the existence of an express agreement that the Oregon County farm was to be pledged as security for any monies J. C. may have given Grace or for any improvements J. C. may have performed. Likewise, no type of security agreement can be found in or implied from the conduct of the parties as described in the record before us. But in addition to the fact no contract can be found or implied whereby Grace agreed the farm should serve as security for any

improvements or payments made by J. C., the latter would also have to overcome the presumption that all post-nuptial payments and improvements were intended as gifts to his wife, Grace. *Davis v. Broughton*, 369 S.W.2d 857, 862[7] (Mo.App.1963). As the last citation attests, "[t]his presumption is a rebuttable one; but, to overcome it, the evidence to the contrary must be so clear, cogent and convincing as to leave no reasonable room for doubt in the mind of the trial chancellor." No evidence of any character was proffered to rebut the presumption. The concluding reason why the trial court did not err in refusing to decree an equitable lien, is that J. C. was fully apprised of the fact the title to the farm reposed solely in Grace and that most of the payments and all of the improvements claimed by J. C. were made following Grace's refusal to add J. C. to the title after Laura's divorce from him became final. Cf. *Welborn v. Rigdon*, 231 S.W.2d 127, 134 (Mo.1950).

While this suit was pending in the circuit court, the parties entered into a stipulation under date of August 31, 1973. Per the stipulation it was agreed, inter alia, that neither J. C. nor Grace would transfer, convey or encumber any of the livestock or other personal property on the farm unless otherwise "agreed upon by the parties and their attorneys." J. C.'s counterclaim (a part of his first amended answer to Grace's amended petition for divorce) stated, among other things, that after the parties had duly entered into the aforementioned stipulation, he had obtained an injunction enjoining Grace from selling and disposing of the livestock, but despite such, Grace had sold the cattle and hogs for a total of $14,526.34. In the concluding paragraph of Count II of the counterclaim, J. C. prayed that the court find Grace to be "in contempt of this Court for violating the injunction issued herein on or about September 4, 1973."

One of the points relied on by J. C. upon appeal is that the trial court erred in failing to enforce its injunctive order against

Grace. The authorities cited to this point are aimed at J. C.'s right to an injunction, not to his apparent complaint of the failure of the court to punish Grace for contempt.

▉ The injunction relied on by J. C., was issued by the Magistrate Judge of Oregon County, Missouri. It enjoined Grace from selling, disposing, encumbering or removing any cattle, hogs or personal property located on the farm. Presumably the injunction issued under § 526.020 RSMo 1969. If so, its validity is in doubt. The law states: "Before an injunction shall be granted by the magistrate court or any magistrate, the applicant shall produce satisfactory evidence that there is not then any circuit court in session nor any judge of the circuit court within such county." According to the magistrate's order, the injunction issued "upon reading the petition," what appeared "thereby", and "upon the facts stated in the petition." Pleadings, of course, do not prove themselves. *Gonseth v. K & K Oil Company*, 439 S.W.2d 18, 25 (Mo.App.1969). Ergo, whether satisfactory evidence was produced to prove there was not then a circuit court in session nor any judge of the circuit court within Oregon County when the magistrate issued the injunction or whether, as indicated, the issuance was in reliance on the petition only, is left for us to guess. In any event, it appears the issuance of the injunction was, in part at least, improper. In his petition for the injunction filed four days before its issuance, J. C. verified that Grace had already sold some of the hogs and had arranged for the cattle to be transported to a sale. Whether the sale of the cattle was a fait accompli when the injunction issued, we do not know. Nevertheless, it was wrong to issue the injunction as it related to the swine, for the well-settled and familiar law is that an injunction should not be granted to restrain the doing of an act which has already been done. The purpose of an injunction is to prevent future mischief. *Hurtgen v. Gasche*, 227 S.W.2d 494, 498[3] (Mo.App.1950), and cases collected in 16 Mo. Digest, Injunction, ⊸4.

▉ But to leave the foregoing, our quandary is not conditioned upon the validity or invalidity of the magistrate's injunctive order. The true problem it seems, is: Did the trial chancellor err to J. C.'s prejudice in not punishing Grace for contempt? For solution we quote from 17 C.J.S. Contempt § 57, pp. 131–133: "The power to punish for contempt should be used sparingly, wisely, temperately, and with judicial self-restraint. It should be exercised with caution, deliberation, due regard to constitutional rights, and in accordance with law. While the power may and should be used in an appropriate case, it should not be used unless the case clearly calls for its exercise. The power should be exercised only when necessary to prevent actual, direct obstruction of, or interference with, the administration of justice. Within these limitations, however, the matter of determining and dealing with contempts is within the court's sound discretion, subject to the absolute provisions of the law, and its determination is final unless there is plain abuse of discretion." In view of the doubt cast upon the validity of the injunctive order and the recorded facts heretofore repeated, we cannot pronounce that the trial judge clearly and plainly abused his discretion in failing to declare Grace in and punish her for contempt of court.

The final question we must answer is whether J. C. is entitled to an accounting for his alleged interest in the personal property and livestock that may have been purchased from and can be traced to the deposit in the Alton Bank. We opine he is.

▉ The checking account in the Alton Bank was in the names of "J. C. Fulton or Grace L." It matters not that the account did not designate them as being husband and wife, for they were that in fact at all times herein concerned. *State Bank of Poplar Bluff v. Coleman*, 241 Mo. App. 600, 609, 240 S.W.2d 188, 190 (1951). Under such conditions and irrespective of statutes relating to joint bank accounts [*McIntyre v. McIntyre*, 377 S.W.2d 421,

425[7] (Mo.1964)], the account and deposits thereto are presumed to be held in an estate by the entirety whether the husband or the wife or both furnished the monies that went into the account. *In re Estate of Jeffries*, 427 S.W.2d 439, 444[2] (Mo.1968); *In re Estate of O'Neal*, 409 S.W.2d 85, 90–91[2–5] (Mo.1966). Although the presumption is rebuttable, the evidence to overthrow it must be so strong, clear, positive, unequivocal and definite as to leave no doubt in the chancellor's mind. *In re Estate of Jeffries*, supra, 427 S.W.2d at 444[3]. And logically, if the parties had an estate by the entirety in the account in the Alton Bank, they should have a like interest in the property in which the funds from that account were invested, unless, of course, the type of property purchased (e. g., a suit for J. C. or a dress for Grace) would force an unnatural conclusion. *Pelsue v. Pelsue*, 367 S.W.2d 487, 492 (Mo.1963). Furthermore, where spouses make a mutual effort to accumulate property during the marriage, and there is no agreement to do otherwise, the fruits of their common purpose become an entirety. *Ray v. Ray*, 336 S.W.2d 731, 737 (Mo.App.1960). This principle would clearly apply in considering the increase in the number and value of the livestock initially put on the farm.

This opinion is already more prolix than intended. And since the case cannot be finally decided here but must be remanded in connection with the accounting prayed, we need not repeat and lengthen this effort by repeating the considerations to be heeded by the parties and the trial court, as ably stated in *Leuzinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 396 S.W.2d 570 (Mo. banc 1965); *Pope v. Pope,* 520 S.W.2d 634 (Mo.App.1975); *Coffey v. Coffey, supra,* 485 S.W.2d 167; and other cases therein and hereinbefore cited.

The judgment is reversed and the cause is remanded for further proceedings, including accounting, in accordance with this decision.

All concur.