**Wade SHANKS, Petitioner-Appellant,**

v.

**Fannie Pearl SHANKS (Kilgore), Respondent-Respondent.**

**No. WD 31178.**

Missouri Court of Appeals, Western District.

July 8, 1980.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 4, 1980.

Application to Transfer Denied Sept. 9, 1980.

Robert F. Sevier, Liberty, for petitioner-appellant.

Joseph Y. DeCuyper and Hsiang-Lin Lee, Kansas City, for respondent-respondent.

Before KENNEDY, P. J., and SWOFFORD and PRITCHARD, JJ.

KENNEDY, Presiding Judge.

This is a proceeding by which appellant Wade Shanks sought to have his former wife, respondent Fannie Shanks Kilgore, adjudged guilty of civil contempt in her alleged violation of the court's order granting to appellant visitation rights with the parties' son Brad. After a hearing, the court denied appellant's petition, finding the respondent not to have been guilty of contempt.

From the adverse judgment appellant has appealed to this court, asserting that the trial court's judgment was erroneous in that it was against the weight of the evidence and constituted an abuse of discretion by the court.

We affirm the judgment of the trial court.

The facts are as follows:

The Circuit Court of Clay County on January 28, 1976, entered a decree of dissolution between appellant and respondent. Primary custody of Brad Shanks, their minor child, who was then nine years of age, was given to Fannie. The decree provided for temporary custody to the father on the last weekend of each month, for two-week periods during the summer and a one-week period during the Christmas vacation of each year. Fannie intended at the time to move with Brad to Denver, Colorado, and did so shortly after the decree. The decree provided rather minutely for the beginning and termination times of the temporary custody periods, and for the transportation arrangements.

From the time of the decree until July of 1978 the youngster made his appointed monthly and vacation trips to Missouri in accordance with the terms of the decree. He then ceased the visits, and had not visited appellant from that time up to the time of the hearing in July, 1979, except for a one-week visit during the 1978 Christmas vacation.

Brad made the paternal visits, although reluctantly, until after the July, 1978, visit. He became twelve years of age on July 12, 1978. His father, the appellant, had told him, a year earlier, that at that age he could choose which of his parents he would live with. Brad seized upon this and, according to his mother, the respondent, refused any more to make the Missouri trips to visit appellant, except the Christmas vacation visit in 1978. The reasons given by Brad, both according to his mother's testimony and according to his own *in camera* testimony, were, for one thing, that he was actively engaged in sports, including football, basketball, softball and golf. Brad

had been named the most outstanding running back of the Denver Bronco Little League football team for 1977 and 1978. During the football season, from August to November, games are scheduled every Saturday. He had played in the Junior State Championship Golf Tournament, and at the time of trial was spending approximately ten to twelve hours a day at the golf course. The regular monthly weekend visits to his father were unwelcome disruptions of his athletic activities.

The other reason he gave was that he was afraid of his father. He said his father had not struck him, but he "yelled and cussed a lot". The evidence also showed that Brad believed that his father, during the pendency of the divorce action, had shot and wounded his mother, the respondent.

Respondent claimed that she had always encouraged Brad to visit his father under the terms of the decree. At the beginning, she actually flew with him on the plane back to Missouri for his monthly visits and returned with him. Then he began making the trips by himself, although she said he would be nervous, upset and crying when she put him on the plane. It became easier after a few times, she said, and he wasn't so reluctant to go.

Brad began to see a child psychologist in Denver and was admitted to a children's psychiatric ward in October of 1976. He continued to see the child psychiatrist, although at the time of trial he had not seen him since the fall of 1977 or 1978. According to the respondent: "I told Mr. Shanks that on the advice of Dr. LaBau that I should converse with him and let him know of Brad's fears and a little bit about what was bothering him and his activities that he was interested in, so that when Brad would go back Wade would try to work with Brad in these activities and keep his interest in those and keep his mind occupied". According to her, the appellant answered, "It was all a farce that Brad should have to go to a psychiatrist".

Apparently, except for the above conversation between the appellant and respon-

dent about the child psychiatrist's recommendations, there was no contact at all between the appellant and respondent. The conversations with respect to Brad's visits to his father in Missouri were between Brad and the appellant. The appellant would call frequently and talk with Brad. He did not talk with the respondent. He would cajole and threaten Brad, at one time threatening to send the sheriff for him. At another time he said he would fly out to Colorado and get him himself. After Brad's refusal to visit his father after he became twelve years of age, the respondent said she "did explain to him the court ruling and that twelve years old had nothing to do with it". She said, "I encouraged him to visit. I talked to him, but not that, 'It's my obligation that you do this'. That it's a court order. This is the way—but, 'It's my obligation'."

In his *in camera* testimony, Brad said that his mother had offered each month to take him to the plane, and on one occasion had taken him but that he had refused to board the plane. "She told me—she talked to me. She said that she would reason with me." Brad was quite emphatic in his *in camera* testimony that he did not want to visit his father.

As stated above, the judge found that the respondent was not guilty of contempt. The rule in these civil contempt cases, with respect to the scope of review, is that we do not disturb the ruling of the trial court unless we believe upon the evidence his ruling was a clear abuse of discretion. *In re Blankenship*, 553 S.W.2d 307 (Mo.App.1977); *Hoog v. Hoog*, 545 S.W.2d 303 (Mo.App.1976); *Fulton v. Fulton*, 528 S.W.2d 146, 157 [25–27] (Mo.App.1975). In this case, we cannot say that the conduct of the respondent was clearly contumacious and that the trial court abused his discretion in finding that it was not so.

It is true, as appellant reminds us, that it is not ordinarily necessary to show, on the part of a party to a court decree that his violation of its terms was willful and intentional with a deliberate purpose to flout the order of the court. *Teefey v.*

*Teefey*, 533 S.W.2d 563 (Mo. banc 1976); *Chemical Fireproofing Corp. v. Bronska*, 553 S.W.2d 710–716 (Mo.App.1977). However, in child custody and visitation cases, the courts have not been willing to impose the harsh sanction of contempt upon a parent unless his disobedience of the court's decree is willful and intentional. *McMullin v. Sulgrove*, 459 S.W.2d 383 (Mo. banc 1970); *Bender v. Young*, 252 S.W. 691 (Mo. 1923); *Durbin v. Durbin*, 573 S.W.2d 146 (Mo.App.1978); *In re Blankenship, supra.*

To what length a mother must go to overbear the will of a twelve-year-old boy in a case such as this—where the required visits are onerous to the child, where they cause him unhappiness and distress, and where he opposes the trips with tearful pleas—is an agonizing question for the parents, the trial courts and for us. The trial court decided that the mother in this case was not guilty of contempt. We cannot say he was wrong. *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976).

The judgment is affirmed.

All concur.